Ron HARPER, Kevin Perkins, William Elliot, and Robert McCoy,
Plaintiffs,

v.

CITY OF CHICAGO HEIGHTS, and the Chicago Heights Election Commission,
Defendants.

No. 87 C 5112.

United States District Court,
N.D. Illinois, E.D.

May 17, 1993.

James C. Craven, James C. Craven, P.C., Donald M. Craven, Donald M. Craven, P.C., Springfield, IL, Michael P. Seng, Chicago, IL, for plaintiffs.

Kai A. Nebel, James J. Casey, Jill E. Evans, Keck, Mahin & Cate, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

### INTRODUCTION

The city of Chicago Heights, Illinois is governed by a mayor and four commissioners, each elected to four year terms by an at-large voting system. Plaintiffs have challenged the method of commissioner elections, arguing that it dilutes the voting strength of African–American voters, in violation of section three of the Voting Rights Act Amendments of 1982. 42 U.S.C. § 1973. Plaintiffs seek to replace the at-large voting system with single member districts, order new elections, and recover their costs and attorneys fees.

The parties filed cross-motions for summary judgment, and the court referred the matter to Magistrate Judge Rosemond. In his report and recommendation, Judge Rosemond recommended the court deny each of the parties' motion for summary judgment.[1] Plaintiffs' motion asked, in the alternative, for partial summary judgment on specific topical areas important to § 1973 analysis. Judge Rosemond recommended this motion be granted in part and denied in part, finding that genuine issues of material fact existed as to most of these issues, but that no genuine issues of material fact existed as to two of the three prerequisites to suit under § 1973:

1. The black community in Chicago Heights is sufficiently compact and contig-

uous to form a voting age population majority in two of seven districts.

2. Voting in Chicago Heights is racially polarized.

Before the court are defendants' objections to the report and recommendation.

■ The court may accept, reject or modify the magistrate judge's recommended decision. Should a party file an objection to the report and recommendation, the court shall conduct a de novo review upon the record. Fed.R.Civ.P. 72(b). The court need not conduct a new hearing on the entire matter, but must give "fresh consideration to those issues to which specific objections have been made." 12 Wright & Miller, Federal Practice and Procedure, § 3076.8, at p. 55 (1992 Pocket Part).

■ A violation of § 1973 is established if the totality of the circumstances show that the political processes leading to nomination or election are not equally open to participation to members of a class protected by the act, in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. § 1973(b). The violation may be proved by showing discriminatory effect alone. *Thornburg v. Gingles*, 478 U.S. 30, 35, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986). A typical analysis of the "totality of the circumstances" is based on a non-exhaustive list of factors first created in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973), *aff'd sub nom. East Carroll Parish School Bd. v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), and adopted in the Senate committee report for the 1982 Act. S.Rep. No. 97–417, 97th Congress, 2d. Session, 28–29 (1982), U.S.Code Cong. & Admin.News 1982, p. 177. However, for a violation involving a multi-member at-large electoral scheme, a plaintiff must prove three preconditions: 1) that the minority group protected by § 1973 is large and geographically compact enough to constitute a majority in what would be a single member constituency of the district, 2) that the group is politically cohesive, and 3) that the majority group of the district votes sufficiently as a bloc to enable it to usually defeat the minority's preferred candidate. *Gingles*, 478 U.S. at 50–51, 106 S.Ct. at 2766. If any of these three conditions are not met, sum-

---

1. A copy of Judge Rosemond's report and recommendation is attached to this opinion.

mary judgment is appropriate. *McNeil v. Springfield Park District*, 851 F.2d 937, 942 (7th Cir.1988).

## ARGUMENT

■ Defendants conceded that plaintiffs had proved the first two criteria required by *Gingles,* but challenged plaintiffs' ability to demonstrate a genuine issue of material fact as to whether bloc voting among whites usually prevented the election of the preferred candidate of the black community of Chicago Heights. Plaintiffs for their part, contended that defendants could not demonstrate a genuine issue of material fact as to the absence of white bloc voting. Plaintiffs also moved for summary judgment based on the totality of the circumstances, or in the alternative, for a finding of partial summary judgment as to several of the individual factors listed in *McKeithen.* Judge Rosemond recommended the court find that voting in Chicago Heights was racially polarized, but that the degree of polarization was not substantively significant enough to declare that white bloc voting would usually defeat the black community's preferred candidate. Judge Rosemond also recommended the court find that genuine issues of fact existed with regard to the other *McKeithen* factors. Plaintiffs have not objected to these recommendations and, having reviewed this portion of the report and recommendation, the court adopts its conclusions.

■ The magistrate judge's analysis utilized the statistical methods of the *Gingles* district court, approved but not mandated by the Supreme Court. *Gingles,* 478 U.S. at 52–53, 61, 106 S.Ct. at 2767, 2772. This approach requires an inquiry into the existence of racial polarization in voting—whether a consistent relationship exists between voter race and the way they vote or, in more ultimate terms, whether blacks and whites vote differently. Racial polarization must be statistically significant, and not an irreprodu-

cible result of chance factors. It must also be "substantively significant", meaning that election results would be different if the voting were held among only whites or only blacks. *Id.,* at 52–53, n. 21, 106 S.Ct. at 2767, n. 21. Plaintiffs here utilized the same statistical tools as the plaintiffs in *Gingles.* However, rather than duplicate the approach of the *Gingles* district court, as the magistrate judge has done, it seems more appropriate in this case to see if the results of the parties' statistical analyses track the language of the bloc voting requirement.

## I. The Parties' Experts, and Extreme Cases Analysis

■ Plaintiffs' expert witness, Dr. Allan Lichtman utilized two statistical techniques in analyzing Chicago Heights election data between 1975 and 1987, multivariate or "ecological" regression, and extreme case analysis. Ecological regression generates a set of equations which predict voter behavior in response to changes in racial composition of the voting population. Extreme case analysis looks at heavily white or heavily black precincts, in this case precincts with a black or white population of over 90%, to compare black and white voter choices.[2] October 28, 1988 Affidavit of Allan Lichtman. These methods are standard in the statistical literature. *Gingles,* 478 U.S. at 52, n. 20, 106 S.Ct. at 2767, n. 20. Defendant's expert, Dr. Robert Mundt, utilized a correlation matrix to examine the correlation between voter preference and party—the likelihood that if you vote for one candidate, you vote for another candidate of the same party.[3] May 6, 1992 Affidavit of Robert Mundt.

Defendants have offered no critique of Dr. Lichtman's analysis. In contrast plaintiffs, via Dr. Lichtman, have provided the court with a telling critique of Dr. Mundt's work. Dr. Lichtman points out two basic problems with Dr. Mundt's analysis preventing its use to create a genuine issue as to white bloc

---

2. Of the forty-two precincts in Chicago Heights, Dr. Lichtman identified seven where the black population is in excess of 90%, and twenty-five where the white population was in excess of 90%.

3. The parties here both state that the political "parties" which exist in Chicago Heights are not local branches of the national Democratic and Republican organizations, but merely loose local affiliations. Party strength is discussed further, *infra.*

voting. First, Dr. Mundt's analysis was conducted in a racial vacuum. It establishes a correlation between party and voter preference, but it is mute as to the relationship between race and voter preference, which is the legally relevant issue at this stage of the proceedings. It is entirely possible to have a high correlation coefficient for the variable of party affinity and still demonstrate white bloc voting which usually defeats the black community's preferred candidate. Only ecological regression can demonstrate whether this has occurred.

Second, Dr. Mundt's research design would be unable to answer these questions because it cannot weigh and separate the two factors of race and party. Such an analysis is the result of a partial correlation, a correlation between two variables with all other variables controlled. October 21, 1992 Affidavit of Allan Lichtman. To the court it appears that a partial correlation can be derived from extreme case analysis, where the racial composition of each district is essentially homogenous. Dr. Lichtman has supported his critique with citations to the scientific literature. Id.

Dr. Lichtman's unrebutted conclusions from his ecological regression and extreme case analyses are that generally white bloc voting has been able to defeat the black candidate running first among black voters in Chicago Heights. Plaintiff's Exhibit C to Motion for Summary Judgment, at 17. This conclusion is buttressed by the court's own review of the plaintiffs' extreme case analysis data.[4] A protected group's representative of choice is the candidate supported by a majority or plurality of the group's voters. *Williams v. State Board of Elections,* 718 F.Supp. 1324, 1328, n. 8 (N.D.Ill.1989). The data shows that in 1975, Louise Marshall was the black community's candidate of choice, receiving 77% of the vote in black precincts. She was also the only black candidate in the general election. She won election to the city council, garnering 46% of the vote in white precincts. In 1979, Shorter was the black community's candidate of choice, receiving 68% of the vote in black precincts,

beating Marshall by 11 points. Shorter received only 24% of the vote in white precincts and was not elected.

This pattern repeats itself in the next two elections. In 1983, the black candidate of choice was Tolliver, receiving 70% of the vote in black precincts, beating Marshall by 29 points. Tolliver received only 14% of the vote in white precincts, and was not elected. In 1987 Gray was the black candidate of choice, receiving 71% of the vote in black precincts, 20 points higher than the second place finisher, and 41 points ahead of Marshall. However, Gray only received 23% of the vote in white precincts, and was not elected. A change in the pattern occurred in 1991, when Stringfellow the black candidate of choice was elected commissioner.

These results show that in three out of the past five elections the candidate of choice of the black community of Chicago Heights was defeated because of bloc voting by the white community. Moreover, results in later elections strongly suggest that Marshall was the candidate of choice in 1975 by default, since she was the only black candidate up for election that year, and has finished a distant second to the candidate of choice in subsequent elections. White bloc voting "usually" defeats a minority group's candidate of choice if the candidate is defeated more often than not. *Williams,* 718 F.Supp. at 1328. Plaintiffs' extreme case analysis date, coupled with the affidavits of Dr. Lichtman, is such that a reasonable jury, taking all inferences in a light most favorable to defendants, *LaScola v. U.S. Sprint Communications,* 946 F.2d 559, 563 (7th Cir.1991), could not return a verdict for defendants. *Anderson v. Liberty Lobby,* 477 U.S. 242, 250–252, 106 S.Ct. 2505, 2511–2512, 91 L.Ed.2d 202 (1986). Accordingly, plaintiffs have shown an absence of a genuine issue of material fact, and are entitled to partial summary judgment, on the issue of white bloc voting.

## II. Defendants' Objections—Party Voting

■ Defendants' objections to such a conclusion are threefold. First, defendants recapitulate their argument on summary judg-

---

4. The court is deeply indebted to Judge Rosemond in this area for his yeoman service in assembling these results in digestible form. Report and Recommendation, at 17–18.

ment that plaintiffs have usually been able to elect their candidate of choice because, in most of the elections brought to the attention of the court candidates actually elected as commissioners received greater than 51% of the vote in black precincts. However this point is not particularly significant when one considers that in any given election, four seats were available and at most only two of the final candidates were black. In a multiple seat election, the minority group will out of necessity have more than one preferred candidate, and if only one candidate is black, the support of white candidates by a large percentage of black voters is unavoidable. *Citizens For a Better Gretna v. City of Gretna, La.,* 834 F.2d 496, 502 (5th Cir.1987). In such a situation, the proper inquiry is whether one candidate among those receiving a majority also received a significant plurality:

> The mere election of a candidate who appears to have received votes from more than fifty percent of minority ballots does not count as a minority electoral success when each ballot may contain votes for more than one candidate. In such a situation, if there were other candidates, preferred by a significantly higher percentage of the minority community, who were defeated in the same election, then it cannot be fairly said that the minority community has successfully elected representatives of their choice.

*Collins v. City of Norfolk, Va.,* 816 F.2d 932, 937 (4th Cir.1987). Plaintiffs have demonstrated the factual scenario laid out in *Collins.* In 1979 the leading candidate in black precincts beat her nearest challenger by 11 points, and her nearest white challenger by 28 points, yet failed to win election. In 1983 the leading candidate in the black precincts beat his nearest challenger by 29 points yet failed to win election. Finally, in 1987 the leading candidate in the black precincts beat his nearest challenger by twenty points, but was not elected. The fact that in several elections the commissioners elected have received a majority of the vote in black precincts is without significance.

█ Second, defendants argue that plaintiffs have admitted that the defeat of candidate Shorter was not attributable to race,

and that the 1987 election results were the result of party affiliations, not race. In doing so, defendants rely on the plaintiffs' failure to file a response to defendants' statement of uncontested facts supporting their motion for summary judgment. Local Rules 12(M), 12(N)(1). Local Rule 12(N) provides that all material facts in a party's 12(M) statement which are not properly controverted in the opposing party's 12(N) statement will be deemed admitted. The Seventh Circuit has upheld strict application of Local Rule 12(N), *Valenti v. Qualex, Inc.,* 970 F.2d 363, 369 (7th Cir.1992), but it is not mandatory. *See, e.g. Jones v. Board of Education of Township High School District 211,* 651 F.Supp. 760, 765 (N.D.Ill1986); *Dole v. Commonwealth Edison,* No. 91 C 5913, 1992 WL 332300, at *6, n. 1 (N.D.Ill November 6, 1992).

In this case and although plaintiffs did not respond to defendant's statement of facts, they did file a statement of facts to accompany their own motion for summary judgment which brought the same evidence necessary to controvert defendants' statement of facts to the court's attention. It would be too severe a sanction to default either of the parties factually in this case where both sides have obviously gone to such great lengths to present their case to the court. Defendants would do well to note that a strictly objective application of Local rule 12(N) would harm their case as well. Defendants' response to plaintiffs' statement of undisputed and material facts fails to disagree with a number of the paragraphs in plaintiffs' submission, merely stating that they are irrelevant in light of plaintiffs' alleged failure to meet the prerequisites to suit of *Gingles.* This is not the acceptable format for a 12(N) statement, and strict application of the rule could result in a ruling of partial summary judgment on behalf of plaintiffs on a number of the *McKeithen* factors.

Finally, the court addresses defendants' in favor of their argument that election results in Chicago Heights are more a result of party affiliation than race. First, there is the deposition statement of Constance Shorter, the leading vote-getter in black precincts in the 1979 election that her defeat was not

attributable to race. This is not particularly weighty evidence. A losing candidate for office does not necessarily have knowledge of why voters chose to vote for or against her, and probably has less knowledge than a pollster.

Second, there is the opinion of defendant's expert Robert Mundt. As the court has already stated *infra*, this evidence does not raise a genuine issue of fact as to the lack of white bloc voting.[5] If the black community's political cohesion takes on the added dimension of party organization, and their candidates still lose because of white bloc voting, the prerequisites of *Gingles* have still been met. This is not to say however, that Mundt's analysis is irrelevant to the totality of the circumstances to be examined in finding whether a § 1973 violation really exists. There is evidence that over time nascent party organizations have grown in strength so that by 1987 white candidates belonging to one party may outperform black candidates of another party in black areas. While it is the plurality opinion of the Supreme Court that it is the status of a candidate as the representative of a particular racial group, not the race of the candidate, that is important, *Gingles*, 478 U.S. at 68, 106 S.Ct. at 2775, if that candidate loses because he or she is a Democrat or Republican, that is not a violation of § 1973. *See Baird v. Consolidated City of Indianapolis*, 976 F.2d 357, 361 (7th Cir.1992). Thus the focus of this case may turn not only to an examination of the relative importance of race and party affiliation on voter behavior, but to the effects of the candidate slating process and primary elections on the black community's participation in the election of council members.[6]

## CONCLUSION

For the foregoing reasons, the court accepts the magistrate judge's report and recommendation in part. The parties' motions for summary judgment are each denied. Plaintiffs' motion for partial summary judgment is granted in part and denied in part. Pursuant to Fed.R.Civ.P. 56(d), the court shall specify the extent to which plaintiffs' motion has been granted, and the report and recommendation adopted.

The court agrees with the magistrate judge that there is no genuine issue of material fact as to the following facts:

1. The black community in Chicago Heights is sufficiently compact and contiguous to form a voting age population majority in two of seven districts.

2. The black community in Chicago Heights is politically cohesive.

While the the court also agrees with the magistrate judge that there is no genuine issue of material fact that voting in Chicago Heights is racially polarized, the court respectfully disagrees with the magistrate judge's finding that the degree of polarization was not substantively significant enough to declare that white bloc voting would usually defeat the black community's preferred candidate. Accordingly, the court also find that there is no genuine issue of material fact that:

> In 1987, the numbers indicate similar, but smaller shifts. In black areas, Marshall remained at least 8 points above her CCP colleagues, but was 3–5 points below them in white areas. Gray, the black non-CCP candidate, finished 20 points above his white counterparts in black areas, but was bracketed by them in white areas.

5. It is interesting to note the influence of race even during those elections where defendants claim party affiliation controlled voter preference. The winning commissioners in almost all instances belong to the Concerned Citizens' Party (CCP). Party affiliation was strongest in 1983 and 1987, where non-CCP candidates generally finished above CCP candidates in black areas, but below them in white areas, regardless of the candidate's race. However, in 1983, Marshall, the only black CCP candidate, received a 25 point jump in voter percentage from black to white precincts, while her white colleagues received a 50 point jump. Correspondingly, Tolliver, the black non-CCP candidate, dropped 56 points from black to white areas, while his white counterparts dropped 5–18 points.

6. In particular, plaintiffs may produce evidence tending to show that the Concerned Citizens' Party slating and/or primary processes are designed to manipulate the election of a "safe" minority candidate. *Gingles*, 478 U.S. at 75, 106 S.Ct. at 2779.

3. The white majority community in Chicago Heights votes sufficiently as a bloc to enable it, in the absence of special circumstances, to usually defeat the black community's preferred candidate.

■ Finally, the court agrees with the magistrate judge that genuine issues of material fact exist as to the other criteria identified in plaintiffs' motion for summary judgment.

EXHIBIT A
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| RON HARPER, KEVIN PERKINS, WILLIAM ELLIOT, and ROBERT McCOY, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 87 C 5112 |
| CITY OF CHICAGO HEIGHTS and the CHICAGO HEIGHTS ELECTION COMMISSION, | ) ) ) ) ) | Judge Nordberg |
| Defendants. | ) ) | |

**REPORT AND RECOMMENDATION**

**TO THE HONORABLE JOHN A. NORDBERG,** a District Judge of the United States District Court for the Northern District of Illinois.

This matter is before the Court on the motion of plaintiffs for summary judgment, or in the alternative, for partial summary judgment. Plaintiffs ask this Court to find that certain facts exist without controversy and such facts demonstrate that the at-large method of electing members of the Chicago Heights city council dilutes the voting strength of the city's black voters in violation of § 2 et seq. of the Voting Rights Act of 1965, as amended in 1982.

Defendants cross-move for summary judgment. Defendants ask this Court to find that plaintiffs are unable to demonstrate a racially polarized voting pattern that enables the white majority to usually defeat the minority's preferred candidate.[1] This pattern

is a requirement for establishing a violation of § 2 of the Voting Rights Act.[2] For the reasons set forth below, this Court recommends that plaintiffs' motion for summary judgment be denied and their motion for partial summary judgment be approved in part and denied in part. The Court further recommends that defendants' cross-motion for summary judgment be denied.

*FACTUAL BACKGROUND.*

Chicago Heights is governed by a commission form of government which is an authorized form of municipal government under Illinois law.[3] The city council comprises one mayor and four commissioners. The city counsel is elected by an at-large voting system. Primary elections occur only when the field of candidates for commissioner exceeds eight. The four candidates for commissioner who receive the highest number of votes are elected to the council.[4] The entire city council is elected every four years.

---

1. Racial bloc voting is "white majority bloc voting that defeats minority preferred candidates." *Citizens For A Better Gretna v. City of Gretna, Louisiana,* 834 F.2d 496, 502 (5th Cir.1987).

2. "Racial bloc voting is the linchpin of a § 2 vote dilution claim, and plaintiffs must prove it." *City of Gretna,* 834 F.2d, at 499.

3. Ill.Rev.Stats. ch. 24 ¶ 1–1–2 (1987).

4. Chicago Heights does not have a majority-vote requirement, a district residency requirement, an anti-single-shot voting restriction nor a numbered post requirement. Cumulative voting is not permitted.

Candidates are slated by two distinct nonpartisan groups: the Better Government Party (a.k.a. Peoples Party) and the Concerned Citizens Party. The Concerned Citizens Party was organized in 1974–75 to slate candidates in opposition to the incumbents who were otherwise unopposed in 1975.[5] In 1975, the Concerned Citizens Party slated three white candidates and one black candidate to oppose the four white candidates slated by the Better Government Party. The Concerned Citizens Party's slated candidates won three of the four commissioner positions. The organization's black candidate, Louise Marshall, became the first black commissioner elected to the city council.

According to the 1980 Census, the black population in the City of Chicago Heights is 28.7% of the total population.[6] The black voting age population was 14% of the total voting age population in 1970 and 24% in 1980.

In 1979, the Concerned Citizens Party supported the three incumbents slated by the party in 1975 and added another white candidate to run for the fourth position which had been lost to the Better Government Party. The Concerned Citizens Party candidates ran against three white candidates and one black candidate slated by the Better Government Party. All four candidates supported by the Concerned Citizens Party were elected in 1979.

In 1983 and 1987, the incumbents were re-elected. In both elections, the incumbents ran opposed by three white candidates and one black candidate slated by the Better Government Party.

Plaintiffs' expert, Allan J. Lichtman, analyzed the voting patterns of Chicago Heights voters from 1975–87.[7] He used both ecological regression and extreme case analyses. The ecological regression methodology incorporates data from all precincts in the city and generates prediction equations for estimating voter behavior. Extreme case analysis compares the actual choices of voters in the most heavily white and the most heavily black precincts in the city. Out of forty-two precincts in Chicago Heights, Lichtman identified seven precincts where the black population is 90% or more and twenty-five precincts where the white population was 90% or more. Based on the voting patterns identified in Lichtman's analysis, plaintiffs conclude that the at-large method of electing members to the city council dilutes the voting strength of the black voters resulting in the inability of the black community to elect their representatives of choice in violation of § 2 of the Voting Rights Act.[8]

***LEGAL BACKGROUND.***

Section 2 of the Voting Rights Act of 1965, *as amended in 1982*, 96 Stat. 134, reads as follows:

**(a)** No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

**(b)** A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not

---

**5.** Deposition ("Dep.") C. Panici, at 4.

**6.** *See* 1980 Census (Exhibit 24 attached to Defendants' Memorandum in Support of Motion For Summary Judgment). Although 1990 Census records were available in late 1991, the parties did not file updated briefs including such records.

**7.** *See,* Exhibit C attached to Plaintiffs' Memorandum in Support of Motion for Summary Judgment (hereinafter Lichtman).

**8.** 42 *U.S.C.* § 1973.

equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.[9]

Section 2 of the Act was enacted to prohibit the "denial or abridgment of the right of any citizen of the United States to vote on account of race or color."[10] Section 2 was designed to ensure that racial minorities shall not "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[11]

A violation can be proved by showing a discriminatory effect of an election process, rather than having to show a discriminatory intent or purpose in the structure. The 1982 amendment reestablished a "results" test whereby the courts consider a variety of factors to determine whether an election procedure dilutes the voting strength of minorities. The Senate Report on the 1982 amendment listed a number of factors to consider in determining the "totality of circumstances" relevant to a claim of vote dilution. The factors are referred to as the "Senate Report" factors or "*Zimmer* factors."[12]

In *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court considered for the first time the 1982 amendment to § 2 of the Voting Rights Act. Although all of the *Zimmer* factors are relevant in a challenge to an at-large voting system, the Supreme Court established three "preconditions" or threshold requirements which minority voters *must* establish in order to maintain a vote dilution claim under the Voting Rights Act. The minority group must be able to demonstrate that:

1. The group is sufficiently large and geographically compact to constitute a majority in a single-member district.

2. The group is politically cohesive.

3. The white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed . . .—usually to defeat the minority's preferred candidate.[13]

The second and third preconditions involve an inquiry into the existence of racially polarized voting or racial bloc voting.[14] The existence of racially polarized voting can be demonstrated by showing a statistically significant correlation between the race of the voter and the selection of certain candidates such that the **difference** in black and white voting patterns is **substantively significant.**[15] The Supreme Court did not mandate any particular statistical method for establishing a correlation but did consider both ecological regression analysis and extreme case analysis as standard methods.[16]

If a plaintiff can satisfy the preconditions, the court is free to consider the other *Zimmer* factors set out in the legislative history

---

9. Codified at 42 U.S.C. § 1973.

10. 42 U.S.C. § 1973(b).

11. *Id.*

12. One of the first cases to list the factors was *Zimmer v. McKeithen,* 485 F.2d 1297, 1305–07 (5th Cir.1973) *(en banc ), aff'd on other grounds sub nom., East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam). *See also,*

*White v. Regester,* 412 U.S. 755, 766–67, 93 S.Ct. 2332, 2340, 37 L.Ed.2d 314 (1973), upon which the *Zimmer* court relied.

13. *Gingles,* 478 U.S., at 50–51, 106 S.Ct. at 2766.

14. *Id.,* at 56, 106 S.Ct. at 2769.

15. *Id.,* at 52–54 and 62, 106 S.Ct. at 2767–68 and 2772.

16. *Id.,* at 53 n. 20, 106 S.Ct. at 2767 n. 20.

of § 2 of the Voting Rights Act. The *Zimmer* factors provide courts with additional guidance in analyzing a claim of vote dilution.[17] These factors are:

1. The extent of any *history of official discrimination* in the state or political subdivision that touches the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process;

2. The *extent* to which voting in the elections of the state or political subdivision is *racially polarized;*

3. The extent to which the state or political subdivision has used *unusually large election districts,* majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate *slating process,* whether the members of the minority group have been denied access to that process;

5. The extent to which members of the minority group in the state or political subdivision bear the effects of *past discrimination* which hinders their ability to participate effectively in the political process;

6. Whether *political campaigns* have been characterized by overt or subtle *racial appeals;*

7. The *extent* to which members of the minority group have been *elected* to public office in the jurisdiction.[18]

The Senate Report expressly cautions that at-large voting systems are not *per se* violations of the Act.[19] The amendment also includes a disclaimer which provides that the Act does not establish a "right" to have "members of a protected class elected in numbers equal to their proportion in the population."[20] The disclaimer is intended to put to rest concerns voiced about "racial quotas."[21] The *Zimmer* factors are to be considered within the "totality of the circumstances"; they are neither comprehensive nor exclusive. Plaintiffs need not prove any particular number of factors.[22]

Defendants contend that plaintiffs are unable to satisfy the third precondition set forth in *Gingles;* and therefore defendants are entitled to summary judgment. Plaintiffs contend that all the preconditions are met; all the *Zimmer* factors except number six are met; and they are entitled to summary judgment. In the alternative, plaintiffs request a ruling in the form of an order granting partial summary judgment so that certain facts will be deemed established for trial.

### STANDARD ON CROSS-MOTIONS FOR SUMMARY JUDGMENT.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law."[23] A party moving for summary judgment bears the initial burden of establishing lack of a genuine issue of material fact.[24] In its motion, the movant must inform the court of the basis for its motion and identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.[25] In re-

17. *Id.,* at 45, 106 S.Ct. at 2763; *See also, Gomez v. Watsonville,* 863 F.2d 1407, 1419 (9th Cir. 1988).

18. Senate Judiciary Committee Report, at 28–29 (emphasis added) (attached to Memorandum In Support of Defendants' Motion for Summary Judgment).

19. Senate Report, at 16, U.S.Code Cong. & Admin.News 1982, p. 177.

20. § 2 of Voting Rights Act.

21. Senate Report, at 31.

22. *Gingles,* 478 U.S., at 45, 106 S.Ct. at 2763 (citing the Senate Report, at 29–30).

23. Fed.R.Civ.P. 56(c).

24. *Zayre Corp. v. S.M. & R. Co.,* 882 F.2d 1145, 1148 (7th Cir.1989).

25. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

sponding to the motion, the non-movant must set forth specific facts showing that there is a genuine issue for trial on those matters on which it bears the burden of proof.[26] The court's role in summary judgment is to determine whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[27]

When, as in this case, cross-motions for summary judgment have been filed, the court must consider each motion separately.[28] The fact of cross-motions does not establish that there is no factual issue to be resolved, nor that one party or the other is entitled to judgment.[29] As each motion is considered separately, inferences from the same set of facts may be drawn in favor of a party in a motion against him, yet against that same party on the party's own cross-motion.[30]

Granting of summary judgment in a voting rights case is appropriate if the plaintiff *can not* meet the preconditions established by the Supreme Court in *Gingles*.[31] "The creation of preconditions—a choice of clear rules over muddy efforts to discern equity—shields the courts from meritless claims and ensures that clearly meritorious claims will survive summary judgment." [32]

Further, granting partial summary judgment in favor of the plaintiff in some cases may be an appropriate disposition of a voting rights case.[33] A motion under Rule 56 need not be dispositive of all issues in the case.[34] Rule 56(d) provides that if on a motion under this rule, judgment is not rendered upon the whole case or for all the relief asked, and a trial is necessary, the Court shall if practicable make an order specifying the facts that appear without substantial controversy. Upon the trial of the action the facts so specified are deemed established.

With these standards in mind, this Court considers each of the motions beginning with defendants' motion.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

Defendants do not contest plaintiffs' ability to satisfy the first two preconditions required by *Gingles:* geographical compactness and political cohesiveness.[35] Defendants dispute plaintiffs' ability to satisfy the third *Gingles* requirement: the ability to show the existence of racial bloc voting by the white majority such that the majority usually defeats candidates supported by the black minority voters of Chicago Heights.[36] The Supreme Court observed that "the usual predictability of the majority's success distinguishes structural dilution from the mere loss of an occasional election." [37] The minority group must "demonstrate that submergence in a white multimember district impedes its ability to elect its chosen representatives." [38] To pass the threshold requirements, a minority group must be able to show "that the white bloc voting usually thwarts election of the minority's preferred candidate." [39]

---

26.   *Id.*, at 324, 106 S.Ct. at 2553; *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 938 (7th Cir.1989).

27.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

28.   10A C. Wright, A. Miller & M. Kane *Federal Practice and Procedure* § 2720 (1983).

29.   *Robinson v. City of Chicago*, 638 F.Supp. 186, 191 (N.D.Ill.1986), *rev'd on other grounds*, 868 F.2d 959 (7th Cir.1989).

30.   *See*, 6 J. Moore, *Moore's Federal Practice* § 56.13 (2d ed. 1988).

31.   *See, McNeil v. Springfield Park District*, 851 F.2d 937, 942 (7th Cir.1988); *Williams v. State*

*Board of Elections*, 718 F.Supp. 1324 (N.D.Ill. 1989).

32.   *McNeil*, 851 F.2d at 942.

33.   *See, Badillo v. City of Stockton*, No. 5-87-1726 EJG (E.D.Cal. Sept. 23, 1988) (Exhibit A attached to Plaintiffs' Memorandum in Support of Motion for Summary Judgment).

34.   Fed.R.Civ.P. 56(d).

35.   *See*, Memorandum in Support of Defendants' Motion for Summary Judgment, at 18.

36.   *Id.*

37.   *Gingles*, 478 U.S., at 51, 106 S.Ct., at 2767.

38.   *Id.*

39.   *McNeil*, 851 F.2d, at 942.

Defendants' argument on this point is two-pronged. First, defendants assert that the minority voters' preferred candidates in Chicago Heights municipal elections are usually elected. Second, defendants argue that the minority voters of Chicago Heights have been proportionately represented since 1975.

Defendants argue that the minority's preferred candidates were elected in 1975, 1979, 1987, and 1991.[40] Using the seven precincts identified by plaintiffs as having a 90% + black population ("black precincts"), defendants argue that preferred candidates of the black precincts were elected in all but one election (1987) since 1975 and a black candidate was elected in every election. Defendants offer the following data to demonstrate their argument:

| Year | Top Candidates Black Precincts In Order of Finish |
|------|---------------------------------------------------|
| 1975 | (1) Marshall* (B) (CCP) |
|      | (2) Sadus* (CCP) |
|      | (3) Prisco (CCP) |
|      | (4) Gliottoni* (CCP) |
| 1979 | (1) Shorter (B) |
|      | (2) Marshall* (B) (CCP) |
|      | (3) LoBue* (CCP) |
|      | (4) Gliottoni* (CCP) |
| 1983 | (1) Tolliver (B) |
|      | (2) Marshall* (B) (CCP) |
|      | (3) Dieringer |
|      | (4) Stanfa |
| 1987 | (1) Gray (B) |
|      | (2) Faso |
|      | (3) Dill |
|      | (4) Montalvo |
|      | (5) Marshall* (B) (CCP) |

* indicates City-wide winner.
B indicates black candidate.
CCP indicates candidate slated by Concerned Citizens Party.

Defendants point out that in all but one of the elections, from one to three of the top four candidates (winners) in the seven black precincts were in fact elected to the council. Additionally, minority candidates successfully ran for commissioner in each election since 1975. Since one out of four commissioners is black, there is a 25% black representation which is roughly proportional to the black voting population of 24%. White candidates, who received substantial black minority support, were also elected to the city council in three of four elections.

Defendants claim the voting patterns in Chicago Heights are the result of party affiliation rather than a situation where a candidate loses because of his or her race. The opposition to the incumbents in 1979, 1983, and 1987 were affiliated with the Better Government Party including the other black candidate in each election. Even though the municipal elections are technically non-partisan, two of the three unsuccessful black candidates admitted that candidates are generally identifiable as being with a party.[41]

40. The parties were granted leave to update their briefs or case citations in April 1991. In their updated briefs, defendants allege that a black commissioner candidate won in 1991 and received the greatest number of total votes in the black precincts. Defendants' Supplemental Memorandum in Support of Defendants' Motion for Summary Judgment included raw data on the 1991 election without the benefit of either eco-logical regression or extreme case analyses and without reference to whether the candidates had been slated by an organization. Because defendants made no analyses of the 1991 election results, the data submitted was not considered.

41. Dep. C. Shorter, at 36; Dep. G. Gray, at 11.

In Defendant's *Statement of Uncontested Facts*, they assert that the "defeat of Constance Shorter in 1979 was not attributable to race."[42] Defendants support this assertion with a statement by Constance Shorter, a losing black candidate, who expressed her personal opinion that her defeat was not attributable to race.[43] Defendants' *Statement of Uncontested Facts* also asserts "[t]he 1987 municipal election results reveal that voting in the City of Chicago Heights was on the basis of political party or affiliation, and not race."[44] They support this allegation with the deposition of an expert witness, Robert Mundt. Mundt did a "correlation matrix to look at the degree to which candidate coalitions, candidate slates affected the outcome in Chicago Heights."[45] He found a very substantial correlation between coalition affiliation and voting in 1987.[46]

Plaintiffs did not file a response to Defendants' *Statement of Uncontested Facts*. Plaintiffs' failure to file a response admits the defendants' statements of uncontested facts "to the extent these facts find proper support in the affidavits and other supporting material" filed by the defendant.[47]

Defendants' application of the facts indicates a positive relationship between party affiliation and voting pattern. They also present statistics indicating a correlation between the minority's voting pattern and election *success* of candidates receiving support from the seven black precincts. "Usually defeated" does *not* mean "never defeated". Defendants argue that the black electorate's candidates of choice usually win. Defendants' argument has merit.

The challenge is in the definition of "preferred candidate" or "representative of choice." Plaintiffs contend that Commissioner Louise Marshall was elected by virtue of support from the *white* electorate and was not the candidate of choice of the black electorate in 1979, 1983 nor 1987. Marshall does not live in a predominately black precinct and her support in the black community consistently declined from 1975 and 1987. The candidates who finished first in the seven black precincts in three of the four elections were not city-wide winners. In fact, black candidates (Tolliver, Shorter and Gray) who finished first in the seven black precincts, each finished last among white voters. Plaintiffs provide additional statistics demonstrating the correlation between the race of the voters and the selection of candidates.

| Year | Top Candidates<br>Black Precincts<br>In Order of Finish<br>% of Black Voter Support | Top Candidates<br>90%+ White Precincts<br>In Order of Finish<br>% of White Voter Support |
|---|---|---|
| 1975 | Marshall* (B) (CCP) 77% (81%)<br>Sadus* (CCP) 51%<br>Prisco (CCP) 45% (46%)<br>Gliottoni* (CCP) 42% | Gliottini* (CCP) 57% (58%)<br>Sadus* (CCP) 57%<br>Calacci* 51%<br>Prisco (CCP) 48% |

42. *See*, Defendants' Statement of Uncontested Facts, Fact No. 23.

43. Dep. C. Shorter, at 36.

44. *Id.* Fact No. 39 citing to Dep. Robert Mundt, at 54–55.

45. *Id.*, at 51.

46. Dep. Mundt, at 54.

47. *Midwest Circulation v. Edgar*, 1990 WL 44695 (N.D.Ill.1990); Rules 12(M) and (N) Local Rules N.D.Ill.

| Year | Top Candidates Black Precincts In Order of Finish % of Black Voter Support | Top Candidates 90%+ White Precincts In Order of Finish % of White Voter Support |
|------|------|------|
| | Faso 39% (38%)<br>Maloni 38% (37%)<br>Pagoria 32% (30%)<br>Calacci* 30% (29%) | Marshall* (B) (CCP) 46% (45%)<br>Faso 43%<br>Pagoria 42% (41%)<br>Maloni 38% |
| 1979 | Shorter (B) 68% (74%)<br>Marshall* (B) (CCP) 57%<br>Lo Bue* (CCP) 40% (35%)<br>Gliottoni* (CCP) 39% (35%)<br>Walters 34% (35%)<br>Sadus* (CCP) 31% (27%)<br>Hapaniewski 28%<br>Morgan 26% (25%) | Lo Bue* (CCP) 67% (68%)<br>Gliottoni* (CCP) (65%) (66%)<br>Sadus* (CCP) 65% (66%)<br>Marshall* (B) (CCP) 61% (62%)<br>Walters 36%<br>Hapaniewski 33%<br>Morgan 30%<br>Shorter (B) 24% |
| 1983 | Tolliver (B) 70% (76%)<br>Marshall* (B) (CCP) 41% (39%)<br>Dieringer 35% (38%)<br>Stam 33%<br>Onofri 32% (35%)<br>Lo Bue* (CCP) 30% (26%)<br>Sadus* (CCP) 23% (19%)<br>Gliottoni* (CCP) 21% (15%) | Lo Bue* (CCP) 77% (78%)<br>Sadus* (CCP) 75% (76%)<br>Gliottoni* (CCP) 75% (76%)<br>Marshall* (B) (CCP) 67%<br>Stam 28% (27%)<br>Onofri 19%<br>Dieringer 17% (16%)<br>Tolliver (B) 14% (13%) |
| 1987 | Gray (B) 71% (73%)<br>Faso 51% (53%)<br>Dill 50% (53%)<br>Montalvo 50% (52%)<br>Marshall* (B) (CCP) 30% (27%)<br>Lo Bue* (CCP) 22% (17%)<br>Gliottoni* (CCP) 21% (16%)<br>Sadus* (CCP) 17% (12%) | Gliottoni* (CCP) 69% (70%)<br>Lo Bue* (CCP) 69%<br>Sadus* (CCP) 67%<br>Marshall* (B) (CCP) 64% (65%)<br>Faso 26%<br>Montalvo 26%<br>Dill 20% (24%)<br>Gray (B) 23% (22%) |

* indicates City-wide winner.

*B* indicates *black candidate.*

CCP indicates candidate slated by Concerned Citizens Party.

% of vote computed by extreme case analysis (% in parenthesis indicates ecological regression analysis where it differs).

---

The Voting Rights Act is violated if the minority group members "have less opportunity than other members of the electorate to ... elect *representatives of their choice.*"[48] (emphasis added.) The Act does not give guidelines for determining who the "representatives of choice" are. The plaintiffs would have us define the representatives of choice in terms of who can garner the *most* votes among the minority voters in an election where multiple candidates are elected for the same office.

In *Citizens for a Better Gretna v. Gretna*, 834 F.2d 496 (5th Cir.1987), the fifth circuit rejected the idea that any time a candidate gets a majority of the minority vote he or she is the preferred representative.[49] *Gretna* involved at-large multiseat aldermanic elections in which no black had ever been elected despite a 30% black population. The court found a black candidate to be the preferred candidate where two white candidates received a higher percentage of the black vote than the black candidate.[50] The two white

**48.** 42 U.S.C. § 1973(b) (*amended* 1982).

**49.** *See also, Campos v. Baytown,* 840 F.2d 1240, 1245 (5th Cir.1988).

**50.** *Gretna,* 834 F.2d, at 502.

candidates each received 70% of the black vote compared to 67% for the black candidate.

The *Gretna* court found significance in the fact "that the **black** *candidate* preferred by the minority was defeated by white bloc voting." [51] The black candidate only received 11–12% of the white vote. The fact that black voters also supported white candidates "acceptable to the majority" did not negate the white vote defeating a black preference.[52] The *Gretna* court considered the black candidate to be sponsored by the black minority because he received a **significant portion** of the black vote **and** because he was **black**, and because racial bloc voting was present.[53]

In the plurality section of the *Gingles* opinion, Justice Brennen says "it is the *status* of the candidate as the *chosen representative of a particular racial group*, not the race of the candidate, that is important." [54] He concluded that the "race of the candidate **per se** is irrelevant to racial bloc voting analysis." [55]

Unlike some, the fifth circuit does not erroneously interpret Justice Brennan's statements as advancing interest group politics or enforcing proportional representation. The fifth circuit correctly interprets Justice Brennan's comments to mean "that the race of the candidate is in general of less significance than the race of the voter—but only within the context of an election that offers voters the choice of supporting a viable minority candidate." [56]

The Senate Report noted that "the election of a few minority candidates does not necessarily foreclose the possibility of dilution of the black vote.... If it did, the possibility exists that the majority citizens might evade the section, *e.g.*, by manipulating the election of a 'safe' minority candidate." [57] The Senate Report quotes *Zimmer v. McKeithen,* 485 F.2d 1297, 1307 (5th Cir.1973) which noted that if courts were to hold that a minority candidate's success at the polls were conclusive proof of a minority group's access to the political process, they would be inviting attempts to circumvent the Constitution.

Defendants contend that by having Councilwoman Marshall on the council, the minority voters are proportionately represented and that such proportionate representation should defeat Plaintiffs' claim. It is true that the Senate Committee Report identifies the extent to which minority candidates have succeeded as a pertinent factor to consider in a § 2 claim.[58] However, the Senate Report also expressly states that the election of a few minority candidates does not necessarily foreclose the possibility of dilution of the black vote. If it did, the possibility exists that the majority citizens might evade § 2 by manipulating the election of a "safe" minority candidate.[59]

In further support of this contention, defendants refer to Justice Brennan's conclusion in *Gingles* that sustained success of the black voters leading to persistent proportional representation would be inconsistent with allegations that the minority voters were unable to elect representatives of their choice.[60] However, the Supreme Court held that it was not error for the lower court to *refuse* to treat the fact that some black candidates have succeeded as dispositive of the plaintiff's vote dilution claim.[61] Proportionate representation is not the focus of § 2 of the Voting Rights Act. The focus is on the minority's ability to elect their preferred candidate.

Both parties agree that a black candidate won in every election and in three of those elections she was among the top four choices of the seven black precincts. Both parties also agree that winning white candidates where among the top four vote gathers in the seven black precincts. However, the parties

**51.** *Id.* (emphasis added).

**52.** *Id.*

**53.** *Id.*, at 503.

**54.** *Gingles,* 478 U.S., at 68, 106 S.Ct. at 2775 (dicta) (joined by Marshall, J., Blackmun, J. and Stevens, J.) (emphasis added).

**55.** *Id.*

**56.** *City of Gretna,* 834 F.2d, at 503.

**57.** Sen.Rpt., at 30, n. 114.

**58.** *Gingles,* 478 U.S., at 75, 106 S.Ct., at 2779.

**59.** *Id.*

**60.** *Gingles,* 478 U.S., at 77, 106 S.Ct., at 2780.

**61.** *Id.*, at 76, 106 S.Ct., at 2779.

disagree as to whether these candidates where the representatives of choice. Understandably, the defendants claim they were the representatives of choice and the plaintiffs claim they were not.

In *Collins v. Norfolk*, 883 F.2d 1232, 1238 (4th Cir.1989) the court found that the white candidates elected and supported by black voters, but who received fewer votes than the black candidates by black voters, were not the black community's preferred candidates. The *Collins* court found that in the 1974 at-large multiseat city council election, a black candidate who received 73.4% of the black vote was defeated whereas a white candidate receiving 58.2% and another white candidate receiving 56.5% of the black vote were elected. In the 1980 election a black candidate who received 92.9% of the black vote was defeated whereas a white candidate receiving 56.5% of the black vote was elected. In a city with a 35.2% black population, only one member of a thirteen member council was black. The court also found the re-election of incumbent black city council members did not negate the existence of white bloc voting. The fifth circuit concluded that "support for some successful candidates by a majority of minority voters in multimember district races does not prove that the successful candidates were the chosen representatives of the minority when a candidate who received *much greater* minority support was defeated." [62]

The court in *Collins* did not say whether the race of the *candidate* was relevant. However, the court does place relevance on the degree or extent of support amongst the top choices. The court sets forth a test whereby each situation is to be reviewed individually; but there is a *rebuttable* presumption that a winning candidate is not the candidate of choice if another candidate received *significantly* more minority votes.[63] The fifth circuit found "the critical fact is the difference between the black support of the candidate who received the most black votes yet lost and for the candidates who won with fewer black votes." [64] We hold that determining whether candidates are the minority's preferred candidates of choice rests on the relevant degree of support. Plaintiffs claim the top vote gathers were the minority's preferred candidates in Chicago Heights. Dr. Lichtman's analysis indicates that the candidates receiving the highest number of black votes also received a substantially greater percentage of votes than any other candidates supported by the black voters. Using extreme case analysis, Marshall received 77% in 1975 compared to 52% for the second choice candidate. In 1979, Shorter received 68% compared to 57% for the second choice. Tolliver had 70% of the black vote in 1983 and the second choice only had 41% support. Gray's lead in 1987 carried 71% of the black voters compared to 51% for the second choice. In each election the top vote getter received a substantial percentage margin over the second choice candidate.

Statistics alone are not conclusive. The totality of circumstances which lead to the statistics, such as strong political affiliations, must be weighed by the finder of fact. However, we find that plaintiff's have provided sufficient evidence to establish a rebuttable presumption that the top vote gathers among the black voters were the preferred candidates of the minority group.

Plaintiffs also present evidence showing a correlation between the black candidates receiving the most votes from the seven black precincts and the lack of voting support for those same candidates from the surrounding white community.[65] In three elections, the top vote gathers in the black precincts received fewer votes than any of the candidates from the 90%+ white precincts thereby defeating the minority's top vote gathers.

The final determination is an issue of material fact that properly can be resolved only by a finder of fact because it could reasonably be resolved in favor of either party.[66]

**62.** *Collins*, 883 F.2d, at 1240 (emphasis added).

**63.** *Id.*, at 1238.

**64.** *Id.*

**65.** *See*, Exhibit C attached to Plaintiffs' Memorandum in Support of Motion for Summary Judgment.

**66.** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Drawing all inferences in favor of plaintiffs, this Court can not say that plaintiffs are unable to demonstrate the existence of racial bloc voting such that the bloc voting majority usually defeats candidates supported by a politically cohesive minority group. We recommend that summary judgment be denied the defendants.

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT.

The Supreme Court in *Gingles* held that the ultimate finding of vote dilution is a question of fact.[67] The Supreme Court noted that the finder of fact is to consider the "totality of the circumstances" to determine whether the political process is equally open to minority voters.[68] The Supreme Court further stated that such a "determination is peculiarly dependent upon the facts of each case." [69] A court is free to consider any or all of the Senate factors in analyzing a voting dilution claim. Granting summary judgment in this case would be inappropriate given the factual nature of vote dilution cases.[70] Therefore, we recommend that plaintiffs' motion for summary judgment be denied.

Plaintiffs also request the Court to consider the factors individually and make a partial summary judgment ruling on certain facts. Plaintiffs assert that the facts supporting seven propositions are uncontested. The seven purportedly uncontested facts are as follows:

(1) The black community in Chicago Heights is sufficiently compact and contiguous to form a voting age population majority in two of seven districts. (*Gingles* precondition);

(2) Voting in Chicago Heights is racially polarized. (*Gingles* precondition; *Zimmer* factor No. 2).

(3) Chicago Heights, in electing the four commissioners on the city council at-large, uses "an unusually large election district" that enhances the "opportunity for discrimination against the minority group." (*Zimmer* factor No. 3);

(4) Blacks in Chicago Heights are denied access to the slating process employed by the dominant political group in Chicago Heights, the Concerned Citizens Party. (*Zimmer* factor No. 4);

(5) Blacks in Cook County, of which Chicago Heights is a part, have been the victims of official discrimination affecting their right to participate in the political process. This discrimination has taken the form of political gerrymandering. (*Zimmer* factor No. 1);

(6) Black residents of Chicago Heights also bear the effects of historic socioeconomic discrimination in such areas as housing, employment, education and public accommodations, effects which hinder their ability to participate effectively in the political process. (*Zimmer* factor No. 5);

(7) Blacks have not been elected to the city council to an extent sufficient to overcome the dilutive effect that the at-large system has on black voting strength. The black member of the city council, Louise Marshall, is not the candidate of choice of the black voters living in the area comprising a compact and contiguous minority population. (*Zimmer* factor No. 7, *Gingles*, 478 U.S. at 63 [106 S.Ct. at 2773]; Sen.Rpt. at 68);

The evidence presented by the parties in support of their motions for summary judgment demonstrate that genuine issues of material fact exist regarding all but the first two of these "facts."

---

67. *Gingles*, 478 U.S., at 79, 106 S.Ct., at 2781.

68. *Id.*

69. *Id.* (quoting *Rogers v. Lodge*, 458 U.S. 613, 621, 102 S.Ct. 3272, 3277, 73 L.Ed.2d 1012 (1982)).

70. The factual nature of vote dilution cases is recognized by numerous courts in addition to *Gingles*. *See, e.g., McNeil v. Springfield Park District*, 851 F.2d 937 (7th Cir.1988); *Collins v. Norfolk*, 883 F.2d 1232 (4th Cir.1989); and *Gomez v. Watsonville*, 863 F.2d 1407 (9th Cir.1988).

*The black community in Chicago Heights is sufficiently compact and contiguous to form a voting age population majority in two of seven districts.* Plaintiffs state that seven is the appropriate number of districts into which Chicago Heights would be divided under the statutory scheme set out in the Illinois Municipal Code. Plaintiffs submit maps to demonstrate that the black community could form a voting age majority in two of seven proposed districts.[71] Defendants' did not contest the plaintiffs' ability to show geographical compactness either in their own motion for summary judgment nor in their response to plaintiffs' motion. Since there is no disagreement between the parties on this matter, we recommend that partial summary judgment be granted for the plaintiff on this issue. We find as a matter of undisputed fact that the black community is sufficiently compact and contiguous to form a majority in two of seven districts.

*Voting in Chicago Heights is racially polarized.* Racially polarized voting refers to the existence of a correlation between the race of voters and the selection of certain candidates.[72] The plaintiff have demonstrated racially polarized voting patterns by Dr. Lichtman's extreme case analysis and ecological regression analysis.[73] The defendants have not disputed Dr. Lichtman's statistics. The voting pattern in Chicago Heights is clearly polarized along color lines. Black voters prefer black candidates. White voters generally rank black candidates much lower than do black voters. With the sole exception of Ms. Marshall, white voters ranked black candidates last among eight candidates in 1979, 1983 and 1987. Black voters ranked these same candidates first. This represents a clear correlation between the race of the voters and the selection of certain candidates. Accordingly, we find that there is racially

polarized voting by black and white voters in Chicago Heights. We recommend that partial summary judgment for the plaintiffs be granted on this fact. The extent and effect of this polarization must still be determined by the trier of fact at trial.

*Genuine issues of fact exist regarding whether the at-large election system in Chicago Heights enhances the opportunity for discrimination against the black voters.* Plaintiffs claim the voting pattern is racially polarized such that the difference in black and white voting is **substantively significant.** Although the plaintiffs have shown racially polarized voting in Chicago Heights, there still remains a genuine issue of fact as to whether the racially polarized voting is **substantively significant.** There are disputed facts as to who were the minority's preferred candidates and whether the polarized voting usually prevented those candidates from being elected.

Plaintiffs further claim that the at-large system for electing the city commissioners hinders the political access of the minority group because there is no district residency requirement for city council candidates which provides the opportunity for all the candidates to come from outside the minority neighborhoods. Without a doubt, the argument has force. At-large election systems can be vehicles to dilute the black vote. Although suspicious, the fact remains that at-large election systems are not *per se* unlawful.[74] "Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process." [75] This issue involves many of the issues previously addressed in this opinion with regard to defendants' motion. There are genuine issue of material fact regarding the extent to which this type of system may enhance the opportunity for discrimination against the minority group in

---

71. Map of Proposed Districts attached to Exhibit B.

72. *Gingles,* 478 U.S., at 62, 106 S.Ct., at 2772.

73. Lichtman.

74. Senate Report, at 68. *Gingles,* at 46–51, 106 S.Ct. at 2764–67.

75. *Gingles,* at 46, 106 S.Ct. at 2764.

Chicago Heights. We recommend that plaintiffs' motion for partial summary judgment be denied with regard to this issue.

*Genuine issues of material fact exist regarding whether blacks in Chicago Heights are denied access to the slating process.* The existence of slating as it affects access to the political process is relevant.[76] Plaintiffs claim that the Concerned Citizens Party operates to screen candidates and put up a "safe" minority candidate, *e.g.,* Marshall. The slated members of the Concerned Citizens Party won each city council election in 1979, 1983 and 1987. Plaintiffs allege that the candidacy of Marshall effectively divides the black vote so as to frustrate the efforts of the black community to elect a candidate of its choice. They conclude that residents of the black community have no opportunity to slate a candidate who might represent the interests of the black community.

Defendants claim blacks have been substantially involved in the Concerned Citizens Party since its inception. Additionally, the Concerned Citizens Party slated a black candidate in every election since the group was organized. Defendants consider the categorization of Marshall as a "safe" candidate to be unwarranted name calling.

Plaintiffs argue that deposition testimony by members of the Chicago Heights city council show that blacks have *not* been involved in the slating process of the Concerned Citizens Party. Plaintiffs specifically mention that Councilwoman Louise Marshall, the only black member of the council, testified in her deposition that she has never been a member of the slating process, and does not know of any black individuals who were members of the process. Plaintiffs also point out that Commissioner LoBue did not recall whether any blacks were on the slating committee.[77] However, in a deposition, Commissioner Sadus' testified otherwise:

**Q.** Do any blacks work on the Concerned Citizens Committee?

**A.** Yes.

**Q.** Could you name them? Do you know them?

. . . .

**A.** Yes. Larry Stringfellow for the first, lets's say, eight years; Tommy Henderson. I could picture them but I, you know, I can't name them all.

**Q.** Okay. There are others that you—whose names you do not know; is that correct?

**A.** Oh, yes, there are many.[78]

In Marshall's deposition she also addressed black participation in the Concerned Citizens Party:

**Q.** Could you describe—Could you name some of the Black people who help you with your campaign?

**A.** Edith Barnett; Imelda Benson; Marforite Legg; Mabel Hibbler; Clara Lindsay. Need any more?

**Q.** As many as you can remember.

**A.** Well, I can—We could go on and on.

**Q.** Okay. At any rate, you have—there is a large group of black persons that—

**A.** Sure.

**Q.** —help you get elected?

**A.** That help our party.

**Q.** Okay.

**A.** Our organization. It is not a party, it's the organization—it is an organization.[79]

Mr. Robert Grossi was on the slating committee of the Concerned Citizens Party in 1975 and again in 1979. In his deposition, he described an informal process whereby the party was organized and the first slate of candidates for 1975 were decided upon. In response to questioning regarding the slating

**76.** *White v. Regester,* 412 U.S. 755, 766–67, 93 S.Ct. 2332, 2340, 37 L.Ed.2d 314 (1973).

**77.** Dep. LoBue, at 8.

**78.** Dep. Sadus, at 24.

**79.** Dep. Marshall, at 16–17.

process of the later campaigns, Grossi testified as follows:

**Q.** In 1979, how many of the candidates slated by the Concerned Citizens Party were elected? I am talking about again to the four commissioners and the mayor.

**A.** Actually they weren't slated anymore. There was no slating process after that. The four incumbents that won the election in 1975 ran again and Nick LoBue was the only one that joined them and that was the ticket, the Concerned Citizen ticket.[80]

. . . .

**Q.** Has the party been slating someone else other than an incumbent for one of these positions?

**A.** Well, 1979 or—yeah, for Commissioner LoBue who eventually was the choice, there were quite a few other people who were considered for that job.

**Q.** And who was it—how did that process work?

**A.** It was really an informal process. There were other people that were considered for the job and people were sent out to ask them if they would consider running for the job, and depending on their level of interest which waned at times, through process of elimination Mr. LoBue was picked in 1979.

**Q.** Were there again meetings as there were four years earlier at which these matters were discussed?

**A.** Very—yeah, informal, yes sure.

**Q.** Who was present at those meetings?

**A.** I think probably myself and all of the incumbents, maybe other people were interested.

. . . .

**Q.** How many of these individuals are black individuals of the ones that you mentioned?

**A.** Well, Ollie Alexander is black. Joe Hawkins is black. Ed Perkins is black. Estes Ross is black. Louise Marshall is black.[81]

The above testimony demonstrates that there are material facts in dispute as to the level of participation of blacks in the Concerned Citizens Party. Arguably, at best, the above deposition testimony reveals that a haphazard informal slating process existed—and at worse—none existed. Still, the record needs further development on the issue before we could find as a fact that blacks are denied access to the slating process of the Concerned Citizens Party. We recommend that plaintiffs' motion for partial summary judgment on this issue be denied.

***Genuine issues of fact exist regarding whether Blacks in Chicago Heights have been victims of official discrimination in the form of political gerrymandering.*** Plaintiffs refer this Court to cases which found official discrimination in the form of political gerrymandering in Chicago. Chicago is a neighboring city located some distance north of Chicago Heights and within the same county of Cook.[82] Based on these Chicago cases, plaintiffs ask this Court to find as an uncontested fact that there has been official discrimination in Cook County of which Chicago Heights is a part. However it would be improper for us to conclude that there has been official discrimination in Chicago Heights simply because there is evidence of official discrimination in another city within the same county. The plaintiffs have not established any official discrimination within Chicago Heights which is the challenged political unit. They have not pointed to any district gerrymandering, majority vote requirements or other election requirements that impede minority access to the polls. The Court is free to consider "any relevant history or effects of discrimination by others." [83] However the plaintiffs have not established that prior gerrymandering in Chicago effects the black minority's current access to voting in Chicago Heights. Genuine issues of fact exist regarding whether blacks in Chicago Heights have been victims of official discrimination which affects their right to participate in the political process. We

---

80. Dep. Grossi, at 13.

81. *Id.,* at 16–18.

82. *Rybicki v. State Board of Elections,* 574 F.Supp. 1082 (N.D.Ill.1982); and *Ketchum v. Byrne,* 740 F.2d 1398 (7th Cir.1984).

83. *Gomez v. Watsonville,* 863 F.2d 1407 (9th Cir. 1988).

recommend that plaintiffs' motion for partial summary judgment on this issue be denied.

***Genuine issues of material fact exist regarding whether black residents of Chicago Heights bear the effects of historic socioeconomic discrimination in the areas of housing, employment, education, and public accommodations which hinder their ability to participate effectively in the political process.*** Plaintiffs allege that black residents of Chicago Heights have been victims of past discrimination and suffer lower socioeconomic status than white residents. Plaintiffs base their allegations on inferences from current census data and a research report by Luis Fraga and Leroy Bryant on the historic socioeconomic conditions in Chicago Heights.[84] The researchers used census data, public records, newspapers, and academic literature to document a history of racial discrimination and socioeconomic disparity in Chicago Heights. The report documents: (1) racist stereotyping in the newspaper in the 1920's,[85] (2) racial tensions during the 1970's,[86] (3) and patterns of discrimination in housing, employment, education, and politics.[87]

Defendants refute the credibility of the methodology employed by Fraga and Bryant. Their own expert, Dr. Solberg claims the plaintiffs' report (1) used unacceptable methodology for historical research, (2) badly misinterpreted research material, (3) intentionally twists the meaning of data, and (4) ignores a contradictory study. The testimony of Solberg raises material questions regarding plaintiffs' expert testimony.

Defendants further present testimony of witnesses which give evidence that: (1) schools have been integrated since the 1930's,[88] (2) integrated housing exists in Chicago Heights,[89] (3) parks, theaters and public facilities are open to blacks.[90] Genuine issues of material fact exist with regard to the historical discrimination of blacks in Chicago Heights and whether that history hindered the ability of blacks to participate effectively in the political process. Accordingly, we recommend that plaintiffs' motion for partial summary judgment on this issue be denied.

***Genuine issues of material fact exist regarding who were the black voters' candidates of choice.*** Plaintiffs ask this Court to make a determination that Councilwoman Louise Marshall and white candidates supported by the black electorate were not the candidates of choice of the black community. From this determination, plaintiffs further ask the Court to conclude that blacks (or black preferred candidates) have not been elected to the city council to an extent sufficient to overcome the dilutive effect that the at-large system may have on the black voting strength. This Court has addressed this issue extensively in the prior discussion of the defendants' motion for summary judgement. The parties dispute the matter of who were the candidates of choice and both parties have convincing arguments on their side. This factual issue is central to the vote dilution claim and cannot be resolved on summary judgment because of the genuine issues of material fact exist. We recommend that plaintiffs' motion for partial summary judgment on this issue be denied.

***Recommendation:*** For the reasons set forth above, Defendants' motion for summary judgment should be **denied.** Plaintiffs' motion for summary judgment should also be **denied.** Plaintiffs' motion for partial summary judgment should be **allowed in part** and **denied in part.** Plaintiffs' motion for partial summary judgment should be denied with the exception of two factual assertions

84. Report of Dr. Luis Fraga, Exhibit D.

85. *Id.*, at 2–7.

86. *Id.*, at 14–17.

87. *Id.*, at 18–29.

88. Dep. Backwell, at 13.

89. Dep. Ballinger, at 13–14; Dep. Mundt, at 20–21.

90. Dep. Hogeveen, at 10–13; Dep. Marshall, at 33–36.

raised by plaintiffs' motion which the Court has determined are without substantial controversy. Partial Summary Judgment should be entered as to the following:

1. The black community in Chicago Heights is sufficiently compact and contiguous to form a voting age population majority in two of seven districts.

2. Voting in Chicago Heights is racially polarized.[91]

Dated: January 28, 1992

> Respectfully submitted,
>
> /s/ W. Thomas Rosemond, Jr.
> W. Thomas Rosemond, Jr.
> United States Magistrate Judge

---

**91.** Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, the parties must file their objections to the Report and Recommendation with The Honorable John A. Nordberg within 10 days after being served with a copy of the report. Failure to file objections within the specified time period waives the right to appeal the magistrate's report. *Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538 (7th Cir.1986). *See also, Provident Bank v. Manor Steel Corporation,* 882 F.2d 258, 261 (7th Cir.1989) (when a matter has been referred to a magistrate, acting as a special master or § 636(b)(2) jurist, a party waives his right to appeal if he has not preserved the issues for appeal by first presenting them to the District Judge as objections to the magistrate's report).