Robert McCOY, Kevin Perkins,
Ron Harper and William
Elliot, Plaintiffs,

v.

CHICAGO HEIGHTS, Chicago Heights
Election Commission, Defendants.

Robert McCOY, Kevin Perkins,
Ron Harper and William
Elliot, Plaintiffs,

v.

CHICAGO HEIGHTS PARK DISTRICT
and the Cook County Clerk,
Defendants.

Nos. 87 C 5112, 88 C 9800.

United States District Court,
N.D. Illinois,
Eastern Division.

May 28, 1998.

Michael P. Seng, John Marshall Law School, Chicago, IL, J. Timothy Eaton, Theodore E. Harman, Ungaretti & Harris, Chicago, IL, James C. Craven, James C. Craven, P.C., Springfield, IL, for Plaintiffs in 87 C 5112.

Jon Gardner Crawford, Anthony Scariano, Scariano, Kula, Ellch & Himes, Chtd., Chicago, IL, for Defendants in 87 C 5112.

Michael P. Seng, John Marshall Law School, Chicago, IL, J. Timothy Eaton, Theodore E. Harman, Ungaretti & Harris, Chicago, IL, Robert L. Anderson, Robert J. Jenkins, Krohn, Jenkins & Anderson, Chicago, IL, for Plaintiffs in 88 C 9800.

James O. Nolan, Diane M. Baron, Clausen Miller, P.C., Chicago, IL, Robert K. Bush, Nancy L. Kaszak, Ancel, Glink, Diamond, Cope & Bush, P.C., Chicago, IL, Anthony G. Scariano, Kelly Hayden, Scariano, Kula, Ellch & Himes, Chtd., Chicago Heights, Il, Cook County State's Atty., Chicago, IL, for Defendants in 88 C 9800.

### MEMORANDUM OPINION AND ORDER

COAR, District Judge.

Currently pending are the parties' proposals for remedying the Section 2 Voting Rights Act violations found previously by this court. For the reasons stated in this Memorandum Opinion and Order, this court denies the proposals of the City, the Park District, and the class plaintiffs and accepts, in part, the proposal of the individual plaintiffs. As described herein, this court orders that the individual plaintiffs' proposal will be modified by implementing a system under which the aldermen and Park District members are elected at-large utilizing cumulative voting.

I. BACKGROUND

The instant case originated in 1987 and 1988 when the plaintiff class filed complaints on behalf of African–American voters of Chicago Heights against the defendants City of Chicago Heights ("City" or "Chicago

Heights"), the Chicago Heights Election Commission, the Chicago Heights Park District ("Park District"), and Stanley Kusper, the Clerk of Cook County. The plaintiffs alleged that the non-partisan, at-large elections in Chicago Heights City Council and the Chicago Heights Park District Board violated Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1971 *et seq.*, by diluting the opportunity of African–Americans to elect representatives of their choice. This case has a long and complicated procedural history and facts, which are reviewed in earlier opinions and therefore not necessary to review in detail here. *See Harper v. City of Chicago Heights,* 824 F.Supp. 786 (N.D.Ill. 1993) (Will, J.); *Perkins v. City of Chicago Heights,* 47 F.3d 212 (7th Cir.1995); *Harper v. City of Chicago Heights,* 1997 WL 102543 (N.D.Ill. March 5, 1997) (Coar, J.).

As discussed in earlier opinions, pursuant to a consent decree approved by Judge Will on May 24, 1994, the City and the Park District abandoned the at-large election method and created a new system of government. "[T]he new plan was designed around six single member districts for the election of six single member districts for the election of six City Council members and six Park Board Commissioners, with a mayor and Park Board president[1] elected at-large." *Harper,* 1995 WL 706898 at *1. The form of government prescribed in the consent decree was a deviation from the forms of government provided for in the Illinois Municipal Code. *See* discussion, *infra,* Part II.A.2, II. B.2.

Two of the named plaintiffs, Kevin Perkins and Robert McCoy (hereinafter "Perkins and McCoy" or "individual plaintiffs"), appealed the entry of the consent decree to the Seventh Circuit Court of Appeals, which vacated the decree and remanded the case. *See Perkins,* 47 F.3d at 218. The Seventh Circuit found that the parties did not have the ability to consent to modifications in statutorily prescribed forms of government absent a finding that "such a remedy is necessary to rectify a violation of federal law.... Without such findings, however, parties can only agree to that which they have the power to do outside

of litigation." *Id.* at 216. Subsequent to the Seventh Circuit's February 7, 1995 decision, on November 7, 1997, the form of government contained in the consent decree was approved by Chicago Heights voters in a referendum.

On remand, this court found that Judge Will's November 29, 1995 order and the stipulation and agreement satisfy the Seventh Circuit's directive to determine whether there was a violation of the Voting Rights Act. *See Harper,* 1997 WL 102543 at *3. This court further found that, under the at-large system previously in place, "few African–American candidates of choice were ever elected to the city council; the electorate was racially polarized; the at-large election system enhanced discrimination against African–Americans; and African–Americans were denied access to the slating process." *Id.* at *12. In addition, the evidence before this court demonstrated that AfricanAmericans in Chicago Heights "bear the effects of historic discrimination in the areas of housing, employment, education, and public accommodations." *Id.* at *10. Accordingly, this court concluded that it was necessary to determine whether the consent decree sets forth a valid remedy for the City's and the Park District's Section 2 violations. The fact that the form of government provided in the consent decree has been "approved" pursuant to a referendum does not relieve this court of its obligation to decide whether the consent decree remedies the underlying violation. *See id.* at *5.

This court ordered the parties to propose new governmental structures and voting maps designed to remedy the voting rights violations. *See id.* at *14. Subsequently, the City, the Park District, the class plaintiffs, and Harper and McCoy submitted memoranda and documents proposing new forms of government for the City and the Park District.

## II. DISCUSSION

### A. City of Chicago Heights

#### 1. Forms of City Government

The form of government that was in place when the voting rights violation occurred was

---

**1.** The Park Board president serves as the seventh Board member.

the commission form of government, which provided for a mayor and four council members elected at-large. *See* 65 ILCS 5/4–3–1. Under the commission form of government, the four candidates receiving the highest number of votes are elected to the council and elections are held every four years. Cumulative voting was not permitted under the Chicago Heights voting system. *See Harper*, 824 F.Supp. at 793 n. 4 (Ex. A, Report and Recommendation, Nordberg, J.).

The Illinois Municipal Code provides for three other forms of government beyond the commission form: (1) aldermanic; (2) managerial; and, (3) strong mayor. *See* 65 ILCS 5/1–1–1 *et seq.* The "aldermanic" form of government is the basic form of government available to cities in Illinois and is outlined in Article 3.1 of the Municipal Code. Cities may choose to expand upon the aldermanic form of government by adopting the commission, managerial, or strong mayor forms of government. The numbers of aldermen prescribed by the different forms of government vary according to size of the city.[2] Chicago Heights has a total population of 33,072.[3]

Under the aldermanic form of government, cities the size of Chicago Heights are divided into seven wards, with two aldermen per ward. *See* 65 ILCS 5/3.1–20–10. The number of aldermen may be reduced to one per ward pursuant to a referendum. *See* 65 ILCS 5/3.1–20–20. The Code also provides for the adoption of a minority representation plan as a modification to the traditional aldermanic form of government. *See* 65 ILCS 5/3.1–15–35.

The managerial form of government provides for seven wards, with two aldermen per ward, in a municipality the size of Chicago Heights. *See* 65 ILCS 5/5–2–2. Under the strong mayor form of government, a city the size of Chicago Heights is allocated five wards, with two alderman from each ward. *See* 65 ILCS 5/6–3–3. The aldermanic, man-

agerial, and strong mayor forms of government all provide for a city clerk and treasurer elected at-large. *See* 65 ILCS 5/3.1–15–5; 65 ILCS 5/5–2–19; 65 ILCS 5/6–3–3.

### 2. Consent Decree

The type of strong mayor government adopted by the City in the consent decree is a modification of that outlined in the Municipal Code. First, instead of five wards with two alderman each as prescribed by Illinois law for the strong mayor government, the City has six districts with one alderman elected from each. *See* 65 ILCS 5/6–3–5 ("Every city shall have as many wards as one-half the total number of aldermen to which the city is entitled."). In addition, instead of electing the clerk and treasurer at-large, *see* 65 ILCS 5/6–3–3, these officers are appointed by the mayor and approved by the City Council. Also, the mayor currently appoints administrative assistants and a budget and finance director.[4]

### B. Chicago Heights Park District

#### 1. Forms of Government for Park District

The Illinois Park District Code provides that the five candidates who receive the most votes in an at-large election are elected commissioners of the Park District. *See* 70 ILCS 1205/2–9. By referendum or resolution of the Board, the Board may be comprised of seven commissioners.[5] *See* 70 ILCS 1205/2–10a. A Park District Board president may be elected at-large, *see* 770 ILCS 1250/2–15, or elected from within their members by the elected commissioners, *see* 70 ILCS 1205/4–8. The Board president serves as a member of the board with the power to preside at meetings and call special Board meetings:

> The president of any park district shall preside at all meetings of the board, and

---

2. The commission form of government is an exception, providing for four commissioners regardless of the population of the city.

3. *See* Perkins and McCoy Mem. at 2, citing Bureau of Census, Statistical Abstract, 1990.

4. The appointment of a budget and finance director is only statutorily authorized in the strong mayor form of government for cities of 50,000 or more. *See* 65 ILCS 5/6–4–15.

5. In a district where a seven-member board is created, it may later be reduced to five members by referendum. *See* 70 ILCS 1205/2–10a.

shall call special meetings thereof of his own motion or on request of two or more of the members, and in case of a special meeting shall cause a notice to be given to all members as provided by the rule of said board. He shall have. the right to vote upon all questions coming before the board and shall be a member thereof.

70 ILCS 1205/4–9.

### 2. Consent Decree

The consent decree made the following changes to the Park District governmental structure that was in place at the time of the voting rights act violations: the number of Board members is increased from five to seven; the terms are decreased from six to four years; six of the board members are elected from six wards rather than at-large; and, the Board president is elected at-large rather than by the other board members. As is clear from the discussion in the previous subsection the governmental structure provided for the Park District in the consent decree is a modification of the statutorily prescribed form. *See Perkins,* 47 F.3d at 215. In particular, the Illinois Park District Code does not allow for Board members to be elected from individual districts.

### C. Fashioning a Remedy

#### 1. Question Under Review

This court must now decide whether the form of government put in place as a result of the consent decree and subsequent referendum provides a complete and adequate remedy to the Section 2 violation found in this case. As an initial matter, the defendants argue that the proper focus for this court is not whether the new form of government remedies the prior violation of the Voting Rights Act, but rather whether the new form of government is, itself, a violation of the Voting Rights Act. (City Mem. at 11.) According to the defendants, absent a determination that the system implemented by the consent decree and referendum constitutes a separate violation of the Voting Rights Act, this court may not disturb the present form of government. However, the defendants have misread this court's earlier opinion. *See Harper,* 1997 WL 102543 at *12. In that

opinion, this court found that the previous government did violate the Voting Rights Act and therefore this court must review de novo whether the form of government detailed in the consent decree is an adequate remedy.

The fact that the present form of government was approved by the voters in a popular referendum does not satisfy the defendants' burden on review. As the Supreme Court has held:

> An individual's constitutionally protected right to cast an equally weighted vote cannot be denied even by a vote of a majority of a State's electorate, if the apportionment scheme adopted by the voters fails to measure up to the requirements of the Equal Protection Clause. Manifestly the fact that an apportionment plan is adopted in a popular referendum is insufficient to sustain its constitutionality or to induce a court of equity to refuse to act.

*Lucas v. Forty–Forth General Assembly of Colorado,* 377 U.S. 713, 736, 84 S.Ct. 1459, 1473–377, 12 L.Ed.2d 632 (1964). *See also Harvell v. Blytheville School Dist.,* 126 F.3d 1038, 1040 (8th Cir.1997) ("The district court need not defer to a state-proposed remedial plan, however, if the plan does not completely remedy the violation or if the plan itself violates Section 2 of the Act.") (citing *Williams v. City of Texarkana, Ark.,* 32 F.3d 1265, 1268 (8th Cir.1994)).

#### 2. Standard for Judicial Remedy

■ "Once a right and a violation has been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *U.S. v. Paradise,* 480 U.S. 149, 183–84, 107 S.Ct. 1053, 1072–74, 94 L.Ed.2d 203 (1987) (internal quotations and citations omitted). "In fashioning a remedy in redistricting cases, courts are generally limited to correcting only those unconstitutional aspects of a state's plan." *League of United Latin American Citizens v. Clements,* 999 F.2d 831, 847 (5th Cir.1993) (citing *Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982)). Therefore, any remedy ordered by the court must be a tailored remedial response to illegality. *See Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816,

125 L.Ed.2d 511 (1993). *See also Dickinson v. Indiana State Election Bd.,* 933 F.2d 497, 501 n. 5 (7th Cir.1991) ("[A]ny court remedy must be narrowly tailored to include only those measures necessary to cure the effect."). In fashioning a remedy, a district court should not "intrude upon state policy any more than necessary." *Whitcomb v. Chavis,* 403 U.S. 124, 160, 91 S.Ct. 1858, 1878, 29 L.Ed.2d 363 (1971).

### 3. Proposals of the Parties

#### a. Proposals of the City, Park District, and Class Plaintiffs

The City, Park District, and class plaintiffs propose that this court adopt the forms of government for the City and the Park District that are included in the consent decree. The City, Park District, and class plaintiffs agree that the government should be based on a six-district structure, with a modified strong mayor government for the City and a seven-member Park District Board, with the Board president elected at-large. The parties disagree, however, on where the lines dividing the six districts should be drawn.

The Park District and the class plaintiffs argue that the district lines should be drawn as indicated in the consent decree. Curiously, neither the Park District nor the class plaintiffs have provided the court with a block map outlining the districts, statistics indicating the racial composition of each district, or arguments why the lines as drawn are constitutionally permissible. Obviously, this oversight makes it difficult for the court to weigh the ability of the proposed districts to remedy the voting rights violation. The court is aware, however, that the district lines as drawn have resulted in the election of three white, two African–American, and one Latino aldermen. (Perkins/McCoy Mem. at 8.) Therefore, the racial percentage breakdown of aldermen is 50 percent white, 33.3 percent African–American, and 16.7 percent Latino. The mayor, who is elected at-large, is also white. At the present time there are two African–Americans, one Latino, and four whites (including the president) on the Park District Board. (Park Dist. Mem. at 6.) Respectively, the Board is 57.1 percent white, 28.6 percent African–American, and 14.3 percent Latino.[6]

The City is also in favor of a six-district plan, but argues that the lines should be drawn in a different manner. Again complicating this court's ability to compare the plans, the City does not cite a source for its statistical analysis of Chicago Heights, which varies significantly from that proposed by Perkins and McCoy using official census reports. The City's plan would create two majority African–American districts and four majority white districts. (City's Proposed Six District Map; McCoy Aff. at 2.) The City's proposed districts differ from the current scheme supported by the class plaintiffs and the Park District primarily in terms of its effect on Hungry Hill. The City's plan would decrease the minority population in Hungry Hill, primarily through a substantial reduction in the Latino population. According to the City's statistics, the voting age population in Hungry Hill would be 28 percent Latino, 14 percent African–American, and 59 percent white. (City's Proposed Six

---

**6.** According to official census data, the total population of the City of Chicago Heights is 33,072, with 54.8 percent white, 34.8 percent African–American, and 15 percent Latino. (Perkins/McCoy Exhibit 2 at 6.) The City claims that the total population of Chicago Heights is 33,072, with a racial breakdown of 54.8 percent white, 34.8 percent African–American, and 9.7 percent Latino. However, as the City does not cite a source for its data, the court may not verify this statistic. The total voting age population of Chicago Heights is 22,961, with a racial breakdown of 57.36 percent white, 29.77 percent African–American, and 12.87 percent Latino. *See Ketchum v. Byrne,* 740 F.2d 1398, 1412–13 (7th Cir.1984) ("Because minority groups generally have a younger population and, consequently, a larger proportion of individuals who are ineligible to vote ... [w]hen voting age population data are available and the district court accepts them as reliable, it seems reasonable for such data to be used in evaluating minority voting strength ..."). Although the Seventh Circuit has recently held that citizen voting age population is the proper benchmark for measuring proportionality of districts, the parties do not provide the court with any statistics regarding the citizen voting age population. *See Barnett v. City of Chicago,* 141 F.3d 699, 704 (7th Cir.1998), *petition for cert. filed,* May 12, 1998. The 2000 census will undoubtably alter the current statistics regarding the racial makeup of the City.

District Map.) The City's statistics do not account for the non-citizen population among Latinos; which would no doubt result in further dilution of the Latino vote.[7] The class plaintiffs object to the redrawing of the district lines proposed by the City and argue that the City's proposal will dilute the minority representation in the city council by making it unlikely that a Latino could be elected to the council.[8] (Class Pls.' Response at 2.)

### b. Proposal of Perkins and McCoy

The present governmental structure as well as the present district lines are objected to by Perkins and McCoy. The individual plaintiffs propose that the city adopt an Article 3.1 aldermanic form of government with seven single-member districts and a mayor, city clerk, and city treasurer elected at-large. Under the aldermanic form of government, the mayor presides over meetings but only votes in the case of tie votes or where a super-majority is required. *See* 65 ILCS 5/3.1–40–50. The mayor also has veto power, which can be overridden by the council. *See* 65 ILCS 5/3.1–40–45, 50. According to the Perkins/McCoy plan, each elected official would serve a four-year term. For the Park District, Perkins and McCoy propose the creation of a seven-member board, which would elect a Board president from within its ranks.

The districting lines proposed by Perkins and McCoy create seven districts: two majority African–American, three majority white, one majority Latino, and one district in which no single group is in the majority. (Perkins/McCoy Mem. at 13.) In terms of voting age population, the McCoy/Perkins districts provide for two majority African–American districts, four majority white districts, and one Latino "influence" district.[9] (Perkins/McCoy Ex. C.)

Perkins and McCoy allege that, the current system negates the power of the Afri-

can–American and Latino representatives because, under the six-member structure, tie votes have frequently resulted, with the mayor breaking the tie by voting with the white aldermen. Furthermore, under the modified strong mayor government the mayor may exercise veto power, thereby further diluting the power of the minority voters. In addition, the mayor appoints the clerk and treasurer and has the power to hire and fire in certain departments. According to the individual plaintiffs, "the mayor now acts as a seventh alderman—indeed, a super-alderman, who has the power to appoint two important City positions and who is *not* elected from a single-member district, but rather, is elected at-large." (McCoy/Perkins Mem. at 9.) The individual plaintiffs argue that the current system ensures that non-white aldermen cannot approve legislation without white support. However, white aldermen can approve everything without non-white support. McCoy and Perkins present similar concerns regarding the Park District's governmental structure and its effect on the African–Americans' ability to elect a Board president or effect real change in the Park District.

### 4. Analysis of Proposals of the Parties

### a. Form of Government

As this court noted in its earlier opinion, the City's switch to "strong mayor, weak council form of government in which the mayor appoints the heads of two important city departments is an odd way to remedy a voting rights violation." *Harper,* 1997 WL 102543 at *13. In addition, this court indicated that there was nothing in the record in support of the argument that a strong mayor form of City government or a Park District government with a Board president elected at-large "remedied rather than preserved the effects of the prior system." *Id.* Furthermore, the record indicated that "the current

---

7. *See supra* note 6.

8. Although the instant case is brought by African–American plaintiffs, this court must remain mindful of the effect of any proposed remedy on the Latino voting population. *See U.S. v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987) (finding that one of the factors that a court must consider in determining

whether a remedy is narrowly tailored is the "impact of the relief on the rights of third parties.").

9. In the Perkins/McCoy plan, Hungry Hill has a voting age population that is 44.1 percent Latino, 10.8 percent African American, and 45 percent white.

form of government creates a stalemate between minority and non-minority representatives on the city council, while shifting power to the mayor, who is elected at-large." *Id.*

Despite this court's earlier warnings, the parties arguing in favor of the governments provided in the consent decree do not present the court with support for their argument that the consent decree remedies the Section 2 violation. In particular, the parties do not explain how a government structure where the tie-breaking vote is elected at-large remedies a voting rights violation predicated on the fact that the at-large election system enhanced discrimination against African–Americans. By adopting a curious variant of the strong mayor government, the mayor in Chicago Heights is provided powers that exceed those present in other statutory forms of Illinois government. He is able to vote on legislation in the case of a tie, or where a vote greater than a majority is required. *See* 65 ILCS 5/6–4–5. In these tie situations which have resulted, the mayor has voted with the white aldermen. (McCoy Aff. at 3.) In addition, the mayor may veto ordinances passed by the council, which may only be overridden by a three-fifths majority of the council. *See* 65 ILCS 5/6–4–2, 3. The mayor's power is further increased by allowing him to appoint both the city clerk and the city treasurer. *See* McCoy Aff. at 2. Other significant mayoral powers that are peculiar to the strong mayor government include the ability "[t]o appoint and remove his administrative assistants, budget and finance director, heads of all departments, and to appoint and remove all other officers of the municipality, commissions, boards and agencies ...."; "[t]o exercise control of all departments and divisions ...."; "[t]o attend all meetings of the council with the right to take part in the discussions ...."; and, "[t]o recommend to the council for adoption such measures as he may deem necessary or expedient." 65 ILCS 5/6–4–7.

The Park District government in the consent decree is also a strange remedy for a voting rights violation. Despite the fact that the Illinois Park District Code provides that the Board president need not be elected at-large, the remedy in the consent decree for vote dilution caused by the at-large voting system was to allow the Board president to be elected at-large. This result is particularly problematic in a seven-member board structure, where the president has the power to cast tie-breaking votes.

■ The district court need not defer to a state-proposed remedial plan if the plan does not completely remedy the violation or if the plan itself violates Section 2 of the Act. *See Williams v. City of Texarkana, Ark.*, 32 F.3d 1265, 1268 (8th Cir.1994). This court finds that the modified strong mayor government is not a complete remedy to the Section 2 violation, nor is the remedial plan proposed by the Park District. Notably, by granting significant power to the mayor and Board president who are both elected at-large, the proposed systems perpetuate the race-based violation of the Voting Rights Act that occurred in the previous at-large voting system. *See, e.g., Dillard v. Crenshaw County, Alabama*, 831 F.2d 246 (11th Cir.1987) (finding that a proposal for restructuring election scheme for county commission which allowed for an at-large election of the chairperson violated the Voting Rights Act); *Harvell v. Blytheville School Dist.*, 126 F.3d 1038, 1040 (8th Cir.1997) (finding that a 5–2 system proposed by the school district in which five members would be elected from districts and two members would be elected at-large is not an adequate remedy to remedy a voting violation caused by an at-large system: "[t]he inability of black voters to affect the at-large elections under the 5–2 plan is no different from what it was under the previous electoral scheme"); *Buchanan v. City of Jackson*, 683 F.Supp. 1537, 1545 (W.D.Tenn.1988) (Todd, J.) (rejecting a proposed remedy in which six commissioners would be elected from districts and three would be elected at-large because "the potential would remain for the election of an administration that is unresponsive to the needs of the black community"). *See generally Thornburg v. Gingles*, 478 U.S. 30, 49, 106 S.Ct. 2752, 2766, 92 L.Ed.2d 25 (1986) (finding that at-large systems "where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters").

The City, Park District, and class plaintiffs do not propose any alternate remedy for the voting rights violations. Therefore, this court turns to the remedy proposed by the individual plaintiffs Perkins and McCoy. In terms of the City government, this court is in agreement with the individual plaintiffs that a traditional aldermanic form of government would reduce the power of the mayor, who is necessarily elected at-large. One significant difference between these forms of government is that in the aldermanic form a mayor's veto may be overridden by a two-thirds vote of the aldermen, whereas in the strong mayor format a three-fifths majority is required. *Compare* 65 ILCS 5/3.1–40–50 *with* 65 ILCS 5/6–4–3. While it is true that both the aldermanic government and the strong mayor government allow the mayor to cast tie-breaking votes, *compare* 65 ILCS 5/6–4–5 *with* 65 ILCS 5/3.1–40–30, the Perkins/McCoy proposal provides for seven aldermen, thus ensuring that tie votes will not result.[10] Even the City agrees that the creation of six districts, as provided in the City's plan, "may provide more opportunity for even splits by the aldermen ..." (City Mem. at 7.) Another significant difference is that the modified strong mayor government proposed by the City and the class plaintiffs allows the mayor to appoint the city clerk and city treasurer; however, in the aldermanic form of government these officers would be elected at-large. *See* 65 ILCS 5/3.1–20–5.

For similar reasons, this court looks favorably upon the structure of the Perkins and McCoy proposal for the Park District. Rather than perpetuating the dilution of the minority voting strength by electing the Board president at-large, Perkins and McCoy suggest that the president be selected by the seven elected council members. This system would increase the voice of minority voters by not allowing the at-large member to cast tie-breaking votes. Furthermore, the election of the Board president from within the elected Board members is clearly allowed under Illinois law. *See* 70 ILCS 1205/4–8.

In conclusion, this court finds that the remedies proposed by the City, Park District, and class plaintiffs do not adequately address the Section 2 violation. "This court cannot authorize an element of an election proposal that will not with certitude completely remedy the Section 2 violation." *Crenshaw County*, 831 F.2d at 252. In contrast, the Perkins/McCoy remedy for governmental structure offers a more complete remedy, yet is not without its own problems. In particular, this court is troubled by the potential of the seven-district structure to be challenged on Equal Protection grounds.

b. Drawing District Lines

■ Although the Perkins/McCoy proposal is a satisfactory remedy with regards to the governmental structures for the City and the Park District, this court is hesitant to divide Chicago Heights into seven districts. The Supreme Court has held that race must not be a predominant factor in drawing district lines. Voter classifications based upon race are considered suspect and therefore subject to strict scrutiny if they subordinate traditional districting criteria to race. *See, e.g., Bush v. Vera*, 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996); *Shaw v. Hunt*, 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996); *Miller v. Johnson*, 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995); *Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

Thus, fashioning a remedy that will draw district lines so as to remedy a voting rights violation, but without making race a predominant factor, is a complicated undertaking. The opponents of the Perkins/McCoy plan have justifiably argued that the creation of seven wards with the predominant intent of racial gerrymandering runs the risk of being challenged on an Equal Protection basis. Creating majority-minority districts as a remedy to voting rights violations inevitably relies on "a quintessentially race-conscious calculus aptly described as the 'politics of second best.'" *Johnson v. De Grandy*, 512 U.S. 997, 1020, 114 S.Ct. 2647, 2661, 129 L.Ed.2d 775 (1994) (Souter, concurring) (cit-

10. Seven single-member districts is a permissible variant of the aldermanic form of government under the Illinois Municipal Code. *See* 65 ILCS 5/3.1–20–20.

ing B. Grofman, L. Handley & R. Neimi, *Minority Representation and the Quest for Voting Equality,* 136 (1992)). Thus emerges the paradox of fashioning a voting rights remedy based on districts in voting remedy cases. As one district court has aptly noted, any remedial plan "(even one fashioned solely with race-neutral principles) must be ultimately tested by whether it cures the § 2 violation, ... race will always be a factor, for the ultimate question is whether the proposed plan provides the complaining racial group (in this case, African–Americans) equal access to the political process within the context of § 2." *Dillard v. City of Greensboro,* 946 F.Supp. 946, 955 (M.D.Ala.1996) (Thompson, C.J.). Finally, any redistricting plan that this court may approve would be subject to continued constitutional challenges and would require being redrawn after the 2000 census.

### 5. Cumulative Voting

#### a. Cumulative Voting Defined

■ Thus, while this court favors a seven-member structure for the Park District and City, seven, single-membered districts would not an effective remedy for the Section 2 violation in Chicago Heights. However, a drawing of district lines is not required in order to remedy the voting rights violation in Chicago Heights. Rather than dividing the city into seven districts, this court finds that a system of at-large voting that utilizes cumulative voting, in combination with the Perkins/McCoy plan, would successfully remedy the voting rights violation.

Cumulative voting as a remedy functions in the following manner:

> Voters receive as many votes to cast as there are seats to fill; voters then may distribute these multiple votes among minority candidates in any way they prefer. Thus, voters may "plump" all their votes on one candidate—the strategy of choice for minority groups with intense preferences for a particular candidate—or give one vote each to several candidates. If five seats on a city council are to be filled,

voters would have five votes each to distribute as they saw fit.

Richard Pildes & Kristen Donoghue, *Cumulative Voting in the United States,* 1995 U. Chi. Legal F. 241, 254 (1995). *See generally* Richard L. Engstrom, *Modified Multi–Seat Election Systems as Remedies for Minority Vote Dilution,* 21 Stetson L.Rev. 743 (1992); Edward Still, *Alternatives to Single Member Districts, in* Chandler Davidson, ed., *Minority Vote Dilution* 249 (1989). Cumulative voting is frequently used to elect directors of corporations as a strategy for ensuring representation of minority shareholders in the board. *See* Harry Henn & John Alexander, *Laws of Corporations,* (3d Ed.1983) at 495–97. In fact, most states permit cumulative voting for corporations, allowing the individual corporation to elect whether to utilize the voting scheme. *See* Robert Clark, *Corporate Law* § 9.1 at 362 (1986).

If a cumulative voting system were applied to the Perkins/McCoy plan, the seven aldermen and seven Board members would be elected at-large using cumulative voting, rather than electing one alderman and Board member from each district as proposed by Perkins and McCoy.[11] Each voter would be allocated seven votes to use as he or she chooses. Thus, the voter could use all seven votes to elect one candidate, or distribute the votes among several candidates. The seven candidates with the highest number of votes would be elected to office.

There are several distinct advantages to a system of regionwide cumulative voting for local office. In particular, rather than using race as a proxy for voting preference, such a system allows voters to "draw their own jurisdictional boundaries, decide which local governments were most important to them, and allocate their votes accordingly." Richard Briffault, *The Local Government Boundary Problem in Metropolitan Areas,* 48 Stan. L.Rev. 1115, 1156 (1996) (footnote and citation omitted). All minority groups may potentially benefit from such a system—not just racial minorities. For example, in a

---

11. As previously noted, the voting system in place when the voting rights violation occurred did not permit cumulative voting. *Harper,* 824

F.Supp. at 793 n. 4. (Ex. A, Report and Recommendation, Nordberg, J.).

region where Republicans are in a minority, cumulative voting could allow them to elect a candidate of choice. As one commentator has suggested:

> In a multi-seat election, voters can aggregate their votes to reflect the intensity of their preferences. Because voters, depending on their interests, can form coalitions that cut across racial lines, this form of political arrangement diminishes the likelihood of reifying race as a fixed, political category. Members of different racial groups who enter into such alliances are more likely "to find confidence-building measures that build trust and overcome antagonism."

Lani Guinier, *(E)Racing Democracy*, 108 Harv. L.Rev. 109, 133 (footnote omitted). Relevant to the instant case is the fact that cumulative voting would allow minority voters in Chicago Heights, including the African–Americans and Latinos, to elect candidates of choice without creating race-conscious district lines that would be subject to constitutional challenge. Indeed, cumulative voting does not compartmentalize voters according to their race: "the state does not directly single out any particular minorities for special protection through concentration into 'safe' districts." Pildes & Donoghue, *supra*, at 255.

b. Federal Court Precedent

■ The Supreme Court has held that single-member districts are, in general, favorable to at-large voting plans and muti-member districts. *See, e.g., Growe v. Emison*, 507 U.S. 25, 40, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993) (citations omitted). However, the Supreme Court has also consistently held that at-large procedures are not un-

constitutional per se. *See, e.g., Rogers v. Lodge*, 458 U.S. 613, 617, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982); *Fortson v. Dorsey*, 379 U.S. 433, 439, 85 S.Ct. 498, 499, 13 L.Ed.2d 401 (1965). A few Justices have argued that district-based elections represent a political choice and are not necessarily the only suitable remedy for a voting rights violation. *See, e.g., Davis v. Bandemer*, 478 U.S. 109, 160, 106 S.Ct. 2797, 2824, 92 L.Ed.2d 85 (1986) (O'Connor, J., concurring). Thus, although single-member districts may be preferred, they are not by any means an exclusive remedy to voting rights violations. *See, e.g., Dillard v. Town of Cuba*, 708 F.Supp. 1244 (M.D.Ala.1988) (Thompson, J.) (approving a limited voting scheme as a § 2 remedy); *Dillard v. Chilton County Board of Education*, 699 F.Supp. 870 (M.D.Ala.1988) (Thompson, J.) (approving a cumulative voting scheme as a § 2 remedy), *aff'd*, 868 F.2d 1274 (11th Cir.1989); *Cane v. Worcester County, Maryland*, 847 F.Supp. 369, 373 (D.Md.1994) (Young, J.) (ordering a cumulative voting system as a remedy to a § 2 violation).[12]

Indeed, in a recent Voting Rights Act case, Justices Thomas and Scalia suggested that cumulative voting is a "more efficient and straightforward mechanism[ ] for achieving what has already become our tacit objective: roughly proportional allocation of power according to race." *Holder v. Hall*, 512 U.S. 874, 912, 114 S.Ct. 2581, 2601, 129 L.Ed.2d 687 (1994) (Thomas, J. concurring, joined by Scalia, J.). Although it is by far the most common remedy for a Voting Rights Act violation, geographic districting is not a requirement of our political system:

> The decision to rely on single-member geographic districts as a mechanism for con-

12. The court ordered the following cumulative voting plan as a remedy for a Voting Rights Act violation: "Each voter may cast up to five votes in a Commission election, and may cumulate his or her votes for one or more chosen candidates. Winning candidates are the top five who receive the most votes of all Commission candidates seeking office." *Id.* at 371 n. 4. On appeal, the district court's remedy was vacated based on the Fourth Circuit's conclusion that the district court, by immediately ordering the implementation of a cumulative voting scheme, "had deprived the County of an adequate opportunity to submit a remedial plan." *Cane v. Worcester County*, 35 F.3d 921, 928 (4th Cir.1994), *cert. denied*, 513 U.S. 1148, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995). However, the Fourth Circuit limited its decision to the facts of the case, thus leaving open whether a cumulative voting plan may be a proper remedy in some circumstances. *Id.* at 928 ("We are not called upon to outline whether facts and circumstances might justify the imposition of a cumulative voting plan on a political subdivision. Our review is limited by the specific facts and circumstances presented here, and under them, the district court abused its discretion in adopting the cumulative voting scheme proposed by Plaintiffs.").

ducting elections is merely a political choice—and one that we might reconsider in the future. Indeed, it is a choice that has undoubtedly been influenced by the adversary process: In the cases that have come before us, plaintiffs have focused largely upon attacking multimember districts and have offered single-member schemes as the benchmark of an "undiluted" alternative. But as the destructive effects of our current penchant for majority-minority districts become more apparent, courts will undoubtedly be called upon to reconsider adherence to geographic districting as a method for ensuring minority voting power. Already, some advocates have criticized the current strategy of creating majority-minority districts and have urged the adoption of other voting mechanisms—for example, cumulative voting or a system using transferable votes—that can produce proportional results without requiring division of the electorate into racially segregated districts.

... Such changes may seem radical departures from the electoral systems with which we are most familiar. Indeed, they may be unwanted by the people in the several States who purposely have adopted districting systems in their electoral laws. But nothing in our present understanding of the Voting Rights Act places a principled limit on the authority of federal courts that would prevent them from instituting a system of cumulative voting as a remedy under § 2, or even from establishing a more elaborate mechanism for securing proportional representation based on transferable votes. As some Members of the Court have already recognized, geographic districting is not a requirement inherent in our political system.

*Id.* at 909–11, 114 S.Ct. at 2600–01 (1994) (footnotes and citations omitted).

### c. One–Person, One–Vote

██ This court finds that a system of cumulative voting complies with the requirements that the court be mindful of the "one-person, one-vote" requirement of the Equal Protection Clause. According to this principle, courts must equalize the populations in each district as nearly as is practicable.

*Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964). By allowing each voter the same number of votes, cumulative voting subscribes to the one-person, one-vote requirement with numeric exactness. *See, e.g.,* Guinier, *supra,* at 135–36 (finding that cumulative voting is consistent with the one-person, one-vote concept). In contrast, all of the proposals submitted by the parties would result in unequally weighted votes given the variance in the size of the districts and the impossibility of estimating voter turnout and exact populations of districts.

### d. Illinois Voting Principles

Cumulative voting also conforms with Illinois' traditional voting principles. The fact that cumulative voting as a remedy has strong roots in Illinois is important given that the Supreme Court has held that district courts should not "intrude upon state policy any more than necessary" in fashioning remedies for voting rights violations. *Whitcomb v. Chavis,* 403 U.S. 124, 160, 91 S.Ct. 1858, 1878, 29 L.Ed.2d 363 (1971).

Illinois was the first state to introduce a cumulative voting system. *See* Henn & Alexander, *supra,* at 495 n. 12. Cumulative voting for directors of corporations was introduced in Illinois in 1870. *See id.* In addition, cumulative voting was adopted by the Illinois Constitutional Convention of 1869–70 as a device to assure minority representation in the legislature. *See* Charles Hynerman & Julian Morgan, *Cumulative Voting in Illinois,* 32 Ill. L.Rev. 12, 13 (1937). The main reason for the adoption of the cumulative voting system "was a desire to correct the situation wherein southern Republicans and northern Democrats were going unrepresented in the legislature." *Id.* (footnote omitted). Under this system, three representatives were elected for two-year terms from 51 different districts. Voters could cast one vote for three candidates, one and one-half votes for two candidates, or one vote for one candidate and two votes for a second candidate. *See id. See also* Ill. Const. of 1870, art. IV, § § 6, 7, 8. The cumulative voting system in Illinois corporations is still prescribed in some situations, *see* Henn & Alex-

ander, *supra*, at 495 n. 13; however, cumulative voting for the legislature was repealed in 1980, *see Rybicki v. State Board of Elections*, 574 F.Supp. 1082, 1088 n. 17 (N.D.Ill.1982).

Cumulative voting nonetheless remains firmly established as a statutory form of city government in Illinois. As previously noted, the Illinois Municipal Code provides for a form of cumulative voting in a variant of the aldermanic form of government. Under the minority representation plan:

> [E]ach elector may cast as many votes as there are aldermen to be elected in the elector's district, or may distribute his or her votes, or equal parts of the votes, among the candidates as the elector sees see fit. The candidate highest in votes is elected if only one alderman is to be elected; the candidates highest and next highest in votes are elected if only 2 aldermen are elected; the 3 highest candidates in votes are elected when 3 aldermen are to be elected.

65 ILCS 5/3.1–15–35.

III. CONCLUSION

In conclusion, this court orders that the City of Chicago Heights and the Chicago Heights Park District implement the governmental forms discussed in this Memorandum Opinion and Order. In accordance with the Perkins/McCoy plan, the City must adopt an aldermanic form of government, as provided in Article 3.1 of the Illinois Municipal Code. The City will have a total of seven aldermen, who will be elected at-large by cumulative voting for four-year terms. The voting procedure will be as outlined in this opinion—a modified form of the "minority representation plan" provided for by Illinois law in the aldermanic form of government. Each voter will be allocated seven votes to use as he or she chooses, and the seven candidates with the most votes will be elected to office. The mayor, city treasurer, and city clerk will be elected at-large.

The Park District is ordered to adopt a seven-member Board which will elect the Board president from among its ranks, as provided in the Illinois Park District Code. The seven members of the Board will be elected at-large by cumulative voting for four-year terms. Accordingly, voters will be given seven votes to cast for the Park District Board and the seven candidates with the highest number of votes will be elected to office.

It is so ordered.