In the
United States Court of Appeals
For the Seventh Circuit

Nos.  98-2785, 98-2811, 98-2899, 98-3004,
98-3051, 98-3075, 99-2007, 99-2008,
00-1503, 00-1515/1


Ron Harper, Kevin Perkins, William Elliot,
and Robert McCoy,

Plaintiffs-Appellees, Cross-Appellants,

v.

City of Chicago Heights and the Chicago Heights
Election Commission,

Defendants-Appellants, Cross-Appellees,

Ron Harper, Kevin Perkins, William Elliot,
and Robert McCoy,

Plaintiffs-Appellees, Cross-Appellants,

v.

Chicago Heights Park District,

Defendant-Appellant, Cross-Appellee,

and

David Orr, Cook County Clerk,

Defendant-Appellee.


Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 87 C 5112 & 88 C 9800--David H. Coar, Judge.


Argued April 6, 1999--Decided July 27, 2000



   Before Kanne, Diane P. Wood, and Evans, Circuit
Judges.

   Diane P. Wood, Circuit Judge. The wheels of
justice have turned slowly in this voting rights
case, which began more than a decade ago and
continues to accrete new appeals almost by the
month. The finding of a violation of Section 2 of
the Voting Rights Act of 1965, 42 U.S.C. sec.

1971 et seq., has long since been established. Part of the case before us concerns the remedy for that violation. The district court issued an opinion on May 28, 1998, in which it ordered the implementation of a new election method that relies on cumulative voting. The rest of the many appeals consolidated with the case, up to and including those filed in the early spring of the year 2000, concern attorneys' fees. With respect to the remedy, we have reluctantly concluded that the district court moved too quickly in its understandable desire to put this case to rest. We therefore must reverse and remand. This in turn leads us to affirm in part and reverse in part the district court's grant of attorneys' fees and expenses.

I

The facts and procedural history of this case are set forth in detail in previous opinions. See Harper v. City of Chicago Heights, 824 F. Supp. 786 (N.D. Ill. 1993); Perkins v. City of Chicago Heights, 47 F.3d 212 (7th Cir. 1995); Harper v. City of Chicago Heights, 1997 WL 102543 (N.D. Ill. March 5, 1997). To summarize, in 1987 Ron Harper, Kevin Perkins, William Elliot, and Robert McCoy ("the Class") filed a class action against the City of Chicago Heights ("the City"), alleging that the at-large election method used to elect representatives to the City Council diluted the voting strength of African-Americans in violation of Section 2. In 1988, the Class filed an almost identical suit against the Chicago Heights Park District ("the Park District") aimed at changing the at-large election method used to select the Park District Board. (Although the Chicago Heights Election Commission and the Clerk of Cook County were also named as nominal defendants, these cases have been defended by the City and the Park District.) The district court ultimately consolidated the claims and certified the Class.

The Class wanted the court to order the replacement of the at-large voting systems with single-member districts and to award it attorneys' fees and costs. In February 1989, all parties moved for summary judgment. District Judge Nordberg denied the defendants' motion and granted in part and denied in part the Class's motion. He held that the Class had proven the three "Gingles" factors, see Thornburg v. Gingles, 478 U.S. 30 (1986), that are threshold requirements to a Section 2 vote dilution claim./2 See Harper, 824 F. Supp. at 792-93. However, he concluded that genuine issues of material fact remained with regard to the second step to proving a vote dilution claim, the so-called "Senate Report Factors," see S. Rep. No.

417, 97th Cong., 2d Sess. 2, 28-29 (1982)./3 The cases were then reassigned to District Judge Will for trial.

Judge Will conducted pretrial mediation, and a consent decree resulted. The decree abandoned the at-large election method and created a new system of government for both the City and the Park District. The new plan called for six single-member districts for the election of six City Council members and six park board commissioners, with a mayor and a park board president elected at large. Three of the districts would be majority white, two would be majority African-American, and one would have a majority population of African-American and Hispanic residents of voting age. The consent decree plan was based on the "strong mayor" form of government authorized by the Illinois Municipal Code, and it replaced a "commission" form of government. (The Code allows Illinois cities to select among several acceptable forms of government. The "aldermanic" form is the basic form, see 65 ILCS 5/3.1, but cities may expand upon the aldermanic form by adopting the "commission," see 65 ILCS 5/4 et seq., "managerial," see 65 ILCS 5/5 et seq., or "strong mayor," see 65 ILCS 5/6 et seq., forms. Cities may normally adopt, alter, or repeal a form of government only through a referendum. Ill. Const. art. VII, sec. 6(f).)

In a development that would later prove problematic, the consent decree plan departed from the statutory "strong mayor" form in several respects. First, instead of five wards with two aldermen each, the decree called for six wards with one alderman each. Moreover, the mayor was authorized to appoint a city clerk and treasurer (persons usually elected at large), as well as administrative assistants and a budget and finance director (positions usually reserved for cities larger than Chicago Heights). The consent decree plan also modified the statutorily defined form of government for Illinois Park Districts. See 70 ILCS 1205/1-1 et seq. Rather than five commissioners elected at large, the decree called for six commissioners, one to be elected from each ward.

Judge Will approved the consent decree over the objections of Kevin Perkins and Robert McCoy ("the Individual Plaintiffs"), who had by this time split from their fellow class representatives. Perkins and McCoy thus appealed from the order entering the consent decree (with Harper, Elliott, the City, the Park District, and certain nominal defendants listed as appellees). See Perkins, 47 F.3d 212. This court found merit in their challenge and held that the district

court should not have approved a consent decree that overrides state law without making "properly supported findings that such a remedy is necessary to rectify a violation of federal law." Id. at 216 (emphasis removed). Absent a finding of a violation of federal law, a municipality may modify a statutorily prescribed form of government only through a referendum. We vacated the entire decree and remanded for further proceedings.

By the time the decision in Perkins was handed down (February 7, 1995), the City's 1995 general election was approaching. Judge Will ordered that the election should take place as scheduled, but in recognition of this court's concerns, he also directed that the consent decree should be submitted for voter approval through a referendum. At the same time, he noted that the Park District had passed a resolution adopting the new form of governance specified in the decree and thus that no further action was necessary legally to establish the new Park District structure. On November 7, 1995, Chicago Heights held a referendum and the voters approved the new form of city government--which was modeled on and identical to the form adopted in the earlier consent decree. Judge Will passed away shortly thereafter, and these cases, still on remand to the district court, were reassigned to District Judge Coar.

Following this court's instructions on remand, Judge Coar first reiterated that the old, at-large election method violated Section 2, and he made particularized findings to support this determination. See Harper, 1997 WL 102543, at *12. He noted that Judge Nordberg had found the Gingles factors satisfied; he then considered evidence and found that the Senate Report Factors also pointed to a Section 2 violation. Importantly, neither the City nor the Park District have challenged this finding of liability in the present appeal. Next, Judge Coar considered the appropriateness of the remedy adopted first in the consent decree and later through referendum. (We refer in this opinion to the remedy Judge Coar evaluated for the City as the "referendum system," and to the remedy applicable to the Park District as the "resolution system," to reflect the fact that the systems under which both entities had operated at the outset of this litigation had been replaced by remedial measures.) Expressing concern that the referendum system preserved rather than remedied the effects of the former unlawful at-large laws, he ordered the parties to "propose new governmental structures and voting maps designed to remedy the underlying Voting Rights Act violations." Judge Coar allowed the City, the

Park District, and the Class to rely on the referendum system for their proposals.

As requested, the parties submitted their proposals. The City, the Park District, and the Class reaffirmed their support for the referendum system, disagreeing only on where the lines dividing the six districts should be drawn. Perkins and McCoy objected to the solution adopted by consent and later by referendum, arguing that the six-member structure negates the power of the minority representatives because (1) in practice tie votes have frequently resulted, with the mayor (who is still elected at large) usually breaking the tie by voting with the white aldermen; and (2) the mayor may exercise veto power, which can be overridden only by a 3/5 majority of the council (i.e. four of the six aldermen). According to Perkins and McCoy, "the mayor now acts as a seventh alderman--indeed, a super alderman, who has the power to appoint two important City positions and who is not elected from a single-member district, but rather, is elected at-large."

Perkins and McCoy proposed an "aldermanic" form of government with seven single-member districts and a mayor, city clerk, and treasurer elected at large. For reasons that are unclear, their plan too departed somewhat from the statutory aldermanic form, which calls for seven wards with two aldermen each for cities whose population is between 20,000 and 50,000. See 65 ILCS 5/3.1-20-10 & 5/3.1-20-15. Under the aldermanic form of government, the mayor votes in only two circumstances: to break a tie (a situation that simple mathematics indicates is less likely to occur with an odd number of aldermen), or where a super-majority is required by law. Perkins and McCoy proposed that lines be drawn to create three majority-white districts, two majority-black districts, one majority-Hispanic district, and one district in which no single group would be in the majority. For the Park District, Perkins and McCoy proposed a seven-member board (whose members would be elected from the seven districts), which would in turn elect a president from within its ranks.

After reviewing the proposals before him, Judge Coar rejected the referendum system because it still did not remedy the original Section 2 violation. See McCoy v. Chicago Heights, 6 F. Supp.2d 973, 981 (N.D. Ill. 1998). Noting that "the parties do not explain how a government structure where the tie-breaking vote is elected at-large remedies a voting rights violation predicated on the fact that the at-large system enhanced discrimination against African-Americans," id. at 980, Judge Coar found his

concerns justified by the experience under that system that was accruing, which showed that where a tie has resulted in the city council, the mayor has voted with the white aldermen. (With an even number of aldermen, moreover, ties were not uncommon.) Judge Coar also noted that the mayor's authority was further enhanced by allowing him to appoint the city clerk and treasurer, as well as administrative assistants and directors. Id. None of those powers would have belonged to him under the statutory "strong mayor" government. Finally, Judge Coar criticized the use of an at-large method to elect the Park District board president. Id. Illinois law provides that the board president may be elected by the board members, but Judge Coar believed that the use of an at-large election is particularly problematic in a seven-member board structure where the president has the power to cast tie-breaking votes. Id.

Although Judge Coar suggested that the Perkins and McCoy proposal was legally adequate, id. at 981, he did not embrace it without qualification. He was concerned that a plan that requires the drawing of district lines would be the frequent subject of constitutional attack, recognizing that his task was to steer between the Scylla of racially based district lines, e.g., Abrams v. Johnson, 521 U.S. 74 (1997), Bush v. Vera, 517 U.S. 952 (1996), and Shaw v. Hunt, 517 U.S. 899 (1996), and the Charybdis of ineffectual Section 2 remedies. Noting the support for cumulative voting expressed by Justices Scalia and Thomas in Justice Thomas's concurring opinion in Holder v. Hall, 512 U.S. 874, 912 (1994), Judge Coar decided to try that approach. Accordingly, instead of dividing the City into seven districts, the court's order requires the establishment of an at-large system that uses cumulative voting. This came as a surprise to the parties, who had not proposed any such structure, but the court cited to literature indicating that cumulative voting has the benefits of remedying the vote dilution problem while avoiding the constitutional challenges that afflict the drawing of district lines. 6 F. Supp.2d at 982-83. Judge Coar found this benefit significant given the line of Supreme Court decisions just mentioned, and also given the practical fact that any districting plan he approved would have to be redrawn following the 2000 census.

II

The City, the Park District, and the Class attack the district court's holding on several fronts. First, they argue that the court erred when it found that the referendum system did not remedy the Section 2 violation. Because the

modified "strong mayor" plan adopted by the voters in the referendum is a legally adequate remedy, they maintain, the district court was required to accept it. They also suggest that the referendum results can be set aside only if they would independently violate Section 2, and that we should not be worrying about their capacity to cure the earlier Section 2 violation. Second, they argue that even if the referendum plan is an inadequate remedy, the district court's cumulative voting plan is not an acceptable alternative. Finally, the City and the Park District argue that all previous grants of attorneys's fees must be revisited. We address these contentions in turn.

A.

Standing behind the district court's judgment is the earlier finding--unchallenged, as we said--that the at-large system violated Section 2 of the Voting Rights Act. We think it was correct for the court to ask whether the replacement system eventually approved through referendum would remedy the violation; there was no need for the court to view it as if it had emerged from thin air. See Harvell v. Blythville Sch. Dist. #5, 71 F.3d 1382, 1386 (8th Cir. 1995); Jenkins v. Red Clay Consolidated Sch. Dist. Bd. of Educ., 4 F.3d 1103, 1115-16 (3d Cir. 1992). When a Section 2 violation has been found, the district court "must, wherever practicable, afford the jurisdiction an opportunity to remedy the violation first, . . . with deference afforded the jurisdiction's plan if it provides a full, legally acceptable remedy. . . . But if the jurisdiction fails to remedy completely the violation or if a proposed remedial plan itself constitutes a sec. 2 violation, the court must itself take measures to remedy the violation." Dickinson v. Indiana State Election Bd., 933 F.2d 497, 501 n.5 (7th Cir. 1991) (citation and quotations omitted). We review the district court's factual findings regarding a Section 2 violation for clear error and its legal conclusions de novo. Gingles, 478 U.S. at 79. See also Cousin v. Sundquist, 145 F.3d 818, 822-23 (6th Cir. 1998), cert. denied 525 U.S. 1138 (1999).

The district court recognized that courts have relied upon the three factors set forth in Gingles, followed by the nine "Senate Report Factors," in order to decide whether or not a violation of Section 2 exists. See, e.g., Jenkins v. Manning, 116 F.3d 685, 690-92 (3d Cir. 1997); Dillard v. Crenshaw County, Ala., 831 F.2d 246 (11th Cir. 1987). We have no reason here to question that framework. Using it, Judges Nordberg and Will evaluated the original plan

proposed to remedy the violation, but Judge Coar did not perform a similarly detailed evaluation of the referendum plan, largely because no one gave him the information he would have needed to do so. See 6 F. Supp.2d at 978. Instead, he decided that the findings that made the original system infirm were equally applicable to the referendum system. He noted that the problem with the old system was its use of at-large elections, which, given the local political environment, put the positions to be filled beyond the reach of minority voters. Under the plan adopted by the referendum, only the tie-breaker is elected at large, but taken as a whole this had the same diluting effect as the original at-large system. It was also significant that, because the voters had adopted the plan by referendum, the City had been operating under the plan for some time. This gave the court concrete evidence of the plan's effect in reality. That evidence showed that the at-large mayor voted with the white aldermen in the cases where a city council vote resulted in a tie. The court did not make any separate findings about the operation of the plan in Park District elections or governance.

The evidence of the mayor's pattern of voting in tie-breaking situations, taken with the likelihood of ties on an even-numbered council, is enough to support the district court's conclusion that the referendum system did not adequately address the acknowledged problem in the City elections. It is true, as the City points out, that the Supreme Court has held that at-large procedures are not unconstitutional per se. See Rogers v. Lodge, 458 U.S. 613, 617 (1982); see also United States v. Dallas County Comm., 850 F.2d 1433, 1438 (11th Cir. 1988) ("[A]t-large procedures that are discriminatory in the context of one election scheme are not necessarily discriminatory under another scheme.") (citation and quotations omitted). Nonetheless, we are beyond that point here, given the state of this litigation. Appellate review might have been somewhat easier if the district court had discussed each of the Gingles and Senate Report Factors in its evaluation of the limited use of at-large procedures found in the referendum system, but the critical question in the end is whether the court's finding of fact that the newly enacted system would still discriminate against minority voters was clearly erroneous. The court pointed to the evidence that led it to conclude that vote dilution would still rise to the level of a Section 2 violation. Not everyone would agree, but we find the court's conclusion to be within the range of permissible inferences from this evidence, and hence not clearly erroneous. We therefore affirm the district court's rejection of the referendum

system insofar as it is applied to the City.

   With regard to the Park District, the absence
of evidence of continuing discrimination is
significantly more troubling. The Park District
argues that the resolution system (derived like
the referendum system from the consent decree)
has solved its Section 2 violation: the board
president regularly votes with a bloc consisting
of two African-American board members, one
Hispanic, and one white; further, capital
improvement expenditures in African-American and
Hispanic districts have increased substantially,
suggesting that their residents' concerns are
being addressed. Neither the district court's
opinion nor the McCoy and Perkins brief addresses
these contentions. Because the burden of proving
a Section 2 violation lies with the minority
group contesting the current system, see Gingles,
478 U.S. at 50-51, this lack of rebuttal evidence
dooms the challenge to the use of the plan in the
Park District. We reverse the district court's
determination that the plan, as applied to the
Park District, is not a legally adequate remedy.

B.

   The question of the appropriateness of the
court's chosen remedy is also a knotty one. On
this point, our review is for abuse of
discretion. See Connor v. Finch, 431 U.S. 407,
415 (1977) (appellate review of a district
court's choice of remedy in a voting rights case
is for abuse of discretion). Even though this
gives great leeway to the judge who is closest to
the problems, we are compelled to find here that
the remedy for the City crafted by the court
cannot stand at this time.

   The district court's plan suffers from the same
procedural flaw as did the consent decree when it
was first presented to this court: the court's
plan modifies the election methods set forth in
the Illinois Municipal Code without either going
through the statutorily required procedures for
making such changes to electoral methods or
making a judicial finding that it was necessary
to make these changes in order to comply with
federal law. As this court explained in Perkins,
after a finding of a Voting Rights Act violation,
the parties were free to adopt and the district
court to approve

one of the alternative forms of government
provided by Illinois law. However, the parties
cannot modify the chosen form simply at-will. .
. . Any modifications which must be accomplished
through a referendum cannot be made by the
consent decree unless the court finds that the
statutory provisions would violate federal law

and that such changes are necessary to ensure
compliance with federal law.

47 F.3d at 217.

   The procedural holding in Perkins, while
addressed to a slightly different problem, is
equally applicable here, though we note that
nothing in our earlier opinion disapproved of
cumulative voting in the abstract. The Illinois
Municipal Code makes available to cities a
variety of election methods. The district court
should either have selected one of these methods
or found that the Illinois options violate
federal law. Instead, as it had done before, it
opted for a hybrid system without submitting that
plan to the voters, as Illinois law would
require, and without explaining why one of the
State's authorized systems would not do the job.
Although the Municipal Code allows for cumulative
voting, it specifies that a city is to be divided
into districts (not less than two and not more
than six) and that each district is entitled to
three aldermen. 65 ILCS 5/3.1-15-30 & 5/3.1-15-
35. Without a finding that the Code's cumulative
voting method violates federal law, the district
court modified the plan to call for the city-wide
election of seven council members.

   The district court's plan also suffers from a
failure to respect the City's preference for
single-member districts. The Supreme Court has
held that in fashioning an electoral system to
remedy a voting rights violation, courts "should
follow the policies and preferences of the State,
as expressed in statutory and constitutional
provisions or in the . . . plans proposed by the
state legislature, whenever adherence to state
policy does not detract from the Federal
Constitution." White v. Weiser, 412 U.S. 783, 795
(1973). Accordingly, when a legislative body
fails to offer an acceptable remedy, "the court,
in exercising its discretion to fashion a remedy
that complies with sec. 2, must to the greatest
extent possible give effect to the legislative
policy judgments underlying the current electoral
scheme or the legally unacceptable remedy offered
by the legislative body." Cane v. Worcester
County, Md., 35 F.3d 921, 928 (4th Cir. 1994).

   Here, the City has demonstrated a clear
preference for single-member districts. It
proposed a remedial plan that relies on single-
member districts and, in doing so, made a policy
judgment about which electoral schemes are best
suited for the locality. We should defer to the
City's plan to the extent possible as long as it
does not violate federal law. See Cane, 35 F.3d
at 927. Although the district court found that
the referendum system was inadequate, it did not

find that any use of single-member districts violates federal law.

The United States, appearing as amicus curiae, defends the district court's plan on the ground that, under Illinois law, cumulative voting is an accepted electoral practice. Thus, the United States argues, while the district court's plan may have violated the City's preference for single-member districts, the State has no such preference. We find this distinction unconvincing. First, the United States overstates the popularity of cumulative voting in Illinois: although cumulative voting is lawful under the Municipal Code, the use of single-member districts is an equally acceptable electoral practice. Moreover, although Weiser talks of deference to "state policy," a state plan was under attack in Weiser, and its holding is not so limited. The City proposed and must function under the remedial plan and accordingly its judgments are entitled to deference.

It is somewhat troubling that the City has not articulated why it prefers single-member districts over cumulative voting, but this is not an ironclad requirement for public bodies as long as the entity's actual preference can legitimately be inferred from facts on the record. It is obviously true that deference to legislative policy judgments is predicated on the legislature actually having made a policy judgment rather than an arbitrary choice. But we are satisfied that the City did so. Prior to the district court's order, the parties had never thought of cumulative voting. In the absence of a finding that cumulative voting is the only legally viable remedy, the City should have an opportunity to consider the merits and deficiencies of cumulative voting before that system is imposed upon it. We emphasize that our decision should not be understood as a condemnation of cumulative voting. Cumulative voting is, as the Illinois Municipal Code makes clear, a lawful election method that may be implemented under circumstances demonstrating suitable deference to the legislative body. It also has the virtues the district court identified:

[R]ather than using race as a proxy for voting preference, such a system allows voters to draw their own jurisdictional boundaries, decide which local governments were most important to them, and allocate their votes accordingly. . . . All minority groups may potentially benefit from such a system--not just racial minorities. . . . Indeed, cumulative voting does not compartmentalize voters according to their race.

6 F. Supp.2d at 982-83 (quotations and internal citations omitted).

Because we reject the district court's remedy on other grounds, we need not address the City's contention that the decision to increase the number of City Council members from six to seven violates the rule of Holder v. Hall, supra, which holds that the size of a governing body is not subject to a Section 2 vote dilution claim.

III

The remaining issues pertain to the district court's orders awarding attorneys' fees and expenses pursuant to Section 14(e) of the Voting Rights Act, 42 U.S.C. sec. 1973(1)(e), and the Civil Rights Attorney's Fee Award Act, 42 U.S.C. sec. 1988. The first award of attorneys' fees covers the period of time between the beginning of the suit and the entry of the consent decree. On December 15, 1994, Judge Will entered an order that awarded Class Counsel $337,777.98, with $297,930.65 attributable to the City and $39,847.33 to the Park District. This award included a 10% enhancement "to reflect the excellent results achieved." Although this court vacated the December 15 award along with the consent decree, on November 28, 1995, after the referendum, Judge Will re-entered the fee award. The Park District paid its portion. The City initially appealed, but then reconsidered and asked us to dismiss the appeal. We granted the motion to dismiss, so there is currently no dispute as to the fees awarded by Judge Will.

Pending, however, are challenges to Judge Coar's order awarding fees and expenses. On March 26, 1999, Judge Coar awarded Class Counsel $55,665 to cover fees and expenses incurred after the entry of the consent decree. (On April 21, 1999, Judge Coar amended the order, increasing Class Counsel's award to $65,547.50.) Also on March 26, Judge Coar awarded Perkins and McCoy's attorneys $192,803.75; the City is responsible for $100,868.12 and the Park District for $91,935.63. Then on February 9, 2000, the court awarded fees in the amount of $11,065 to the attorneys representing Perkins and McCoy, for work done prosecuting their fee petition. The award does not specify how the fee award breaks down between the City and the Park District.

Both the City and the Park District filed appeals from all these orders; this court has consolidated the appeals that reached us after oral argument in this case with the original appeals. Although the City initially challenged Judge Coar's awards of attorneys' fees to the plaintiffs' counsel, it later asked that that

appeal be dismissed. We granted the motion. Thus, remaining before us are the City's and the Park District's appeals of Judge Coar's March 26, 1999, fee award, which also provided the basis for the February 9, 2000, award of attorneys' fees to Perkins and McCoy.

First, the status of Perkins and McCoy as "prevailing parties" is at issue. The defendants then challenge the reasonableness of the fees awarded.

Section 1988 states that in a civil rights action, "the court, in its discretion, may allow a prevailing party, other than the United States, a reasonable attorney's fee as part of its costs." Because Perkins and McCoy's status as a prevailing party involves elements of legal analysis, our review is de novo. See Jaffee v. Redmond, 142 F.3d 409, 412-13 (7th Cir. 1998). The Supreme Court has stated that the statutory threshold for obtaining attorneys' fees under Section 1988 is "generous." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). To determine if a party is "prevailing," courts ask whether:

the plaintiff has succeeded on any significant issue in litigation which achieved some of the benefit the parties sought in bringing suit. . . . The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute.

Texas Teachers Ass'n v. Garland Independent Sch. Dist., 489 U.S. 782, 791-93 (1989) (citation and quotations omitted). Once a plaintiff qualifies for a fee award by meeting this threshold, "the degree of the plaintiff's overall success goes to the reasonableness of the award . . ., not to the availability of a fee award vel non." Id. at 793.

Perkins and McCoy are prevailing parties insofar as they succeeded in their goal of having vacated what they regarded as an ineffectual consent decree. That this court did not vacate the decree based upon the precise arguments they raised, as the Park District points out, does not matter. They convinced this court that the decree was improperly entered, thereby succeeding on a "significant issue in [the] litigation." Texas Teachers, 489 U.S. at 791. Recognizing this, the City chose not to appeal Perkins and McCoy's prevailing party status so long as the substantive aspects of this case are upheld on appeal. (Because we are reversing some aspects of Judge Coar's decision, we note that the City has reserved its right to object to Perkins and McCoy's status in later proceedings.) The Park

District also argues that it should not be liable for any of the fees incurred by Perkins and McCoy, because they did not appeal the portions of the consent decree that applied to the Park District. See Perkins, 47 F.3d at 217. But the six-district structure also affected the Park District, and the final judgment of this court vacated the entire decree, not just parts of it.

These facts also persuade us that the Park District is being too particular when it asserts that Perkins and McCoy's earlier appeal was not directed against it, and that it therefore should not be responsible for paying fees associated with that appeal. It is true that most of the appeal related to the City, but not all of it did. Judge Coar correctly recognized this on remand, when he reconsidered both the provisions applicable to the City and those applicable to the Park District. The greater problem for Perkins and McCoy is that we have now rejected their challenge to the Park District resolution that implements the earlier consent decree. The fees to which they are entitled from the Park District must therefore be reconsidered. The district court on remand should take into account both whatever contributions they made to the liability findings against the Park District, and their lack of success in changing the remedy for the Park District.

Finally, both the City and the Park District challenge the reasonableness of the district court's fee award to Perkins and McCoy. They allege that (1) counsel for Perkins and McCoy failed to support their claimed hourly rates with sufficient evidence that the rates are reasonable; (2) counsel for Perkins and McCoy used reconstructed time records rather than records made at the time the services were rendered; and (3) counsel for Perkins and McCoy relied on "cluster billing," i.e. grouping several different activities into one description, thus making it impossible to determine whether the individual activities were a reasonable expenditure of time. The defendants maintain that these failings made it impossible for the district court to determine the reasonable value of the services provided. The City also raises a number of challenges to individual entries in the fee petitions. For example, it argues that one of the attorneys for Perkins and McCoy spent an unreasonable amount of time meeting with his clients.

We find no abuse of discretion in the court's decision to accept the proposed hourly rates. The reasonable hourly rate (or "market rate") for lodestar purposes is "the rate that lawyers of similar ability and experience in their community normally charge their paying clients for the type

of work in question." Spegon v. Catholic Bishop of Chicago, 175 F.3d 544, 555 (7th Cir. 1999) (quotations and citations omitted). The attorneys for Perkins and McCoy supported their proposed hourly rates with their own affidavits confirming the reasonableness of these rates as well as affidavits from attorneys practicing in the field. While an attorney's self-serving affidavit alone cannot establish the market rate for that attorney's services, such affidavits in conjunction with other evidence of the rates charged by comparable lawyers is sufficient to satisfy the plaintiffs' burden. Id.

As to the reasonableness of the hours expended, when a fee petition is vague or inadequately documented, a district court may either strike the problematic entries or (in recognition of the impracticalities of requiring courts to do an item-by-item accounting) reduce the proposed fee by a reasonable percentage. See Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc., 776 F.2d 646, 651, 657-58 (7th Cir. 1985); see also Hensley v. Eckerhart, 461 U.S. 424, 433 (1983) (if plaintiff fails to document hours adequately, court may reduce award accordingly). Whichever option the district court chooses, it is required to "provide a concise but clear explanation of its reasons for the fee award" that is sufficient to permit appellate review. Ohio-Sealy Mattress, 776 F.2d at 658, quoting Hensley, 461 U.S. at 437.

Perkins and McCoy acknowledge that their bills were compiled in part from contemporaneous time records and in part reconstructed. This use of reconstructed records does not doom their petition, as there is no per se rule requiring the submission of contemporaneous time records in the Northern District of Illinois. However, Judge Coar, who concluded that their time records "appear to be contemporaneous," did not address the reliance on reconstructed records. As it is within a district court's power to reduce a fee award because the petition was not supported by contemporaneous time records, see, e.g., Shakman v. Democratic Organization of Cook County, 634 F. Supp. 895, 899 (N.D. Ill. 1986); Rybicki v. State Bd. of Elections of State of Illinois, 584 F. Supp. 849, 861 (N.D. Ill. 1984), we reverse and remand for reconsideration of this issue.

For the reasons discussed above, we AFFIRM the district court's holding that the current election method violates Section 2 of the Voting Rights Act as applied to the City; however, we REVERSE the district court's remedy and REMAND to the court to craft a suitable remedy. We REVERSE the district court's holding that the current election method violates Section 2 as applied to

the Park District. We VACATE in part and AFFIRM in part the March 26, 1999, order and the February 9, 2000, order granting attorneys' fees and expenses. Specifically, we AFFIRM the district court's award of attorneys' fees to Perkins and McCoy from the City and VACATE and REMAND for calculation of the precise amount of fees. We VACATE and REMAND the award of fees to Perkins and McCoy from the Park District; should the district court determine on remand that Perkins and McCoy are entitled to fees for their suit brought against the Park District, it should reconsider the amount, taking into account this opinion. Finally, we do not disturb the award of fees to plaintiffs' counsel--the Park District did not appeal that award and we dismissed the City's appeal of that award on the City's motion. All parties shall bear their own costs attributable to this appeal.

/1 There was also one other appeal initially brought by the Chicago Heights Park District (98-2798); this appeal was dismissed on the Park District's motion before briefing and oral argument.

/2 Those three factors are the preconditions the Supreme Court set out in Gingles for the successful maintenance of a vote dilution claim under the Voting Rights Act. The minority group must be able to demonstrate (1) that the group is sufficiently large and geographically compact to constitute a majority in a single-member district, (2) that the group is politically cohesive, and (3) that the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate. 478 U.S. at 50-51.

/3 The Report lists the following factors:

(1)  the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2)  the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3)  the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4)  if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(5)  the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

(6)  whether political campaigns have been characterized by overt or subtle racial appeals;

(7)  the extent to which members of the minority group have been elected to public office in the jurisdiction;

[(8)]  whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

[(9)]  whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.

Sen. Judiciary Comm. Rept. at 28-29.